IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VINCENT AIENNE CHAPOLINI, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 18-2629 |
| | : | |
| v. | : | |
| | : | |
| ANTHONY CAPODANNO #0119, | : | |
| KEVIN DONOHUE #0026, JAMES | : | |
| FLORES #0125, WALTER MCDONALD | : | |
| (Station Security), GLENN GAMBER | : | |
| (Shift Supervisor), THOMAS JOHNSON | : | |
| (Captain) #0815, individually and in their | : | |
| official capacities, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Smith, J.                                                                        September 5, 2019

The *pro se* plaintiff went to a township police station to report a crime. Instead of reporting that crime, police officers ultimately arrested him after discovering that there were outstanding warrants for his arrest. Although the plaintiff acknowledges attempting to flee after an officer told him that he was under arrest, he alleges that the arresting officers used excessive force when they slammed his head into the ground while arresting him. After the arrest, the plaintiff claims an officer asked him questions without first reading *Miranda* warnings, and the same officer placed him in a jail cell and aggressively strip-searched him.

The plaintiff brings official and individual capacity claims under 42 U.S.C. § 1983 for violations of his constitutional rights against the officers who arrested him and allegedly used excessive force, the officer who conducted the strip search and who questioned him without first giving him *Miranda* warnings, the officer who ran a search for active warrants instead of taking his report of a crime, a supervisor who approved of an incident report indicating that the police

did not read *Miranda* warnings to the plaintiff, and a supervisor who failed to supervise his apprehension (and the excessive force and strip search).

The named officers have moved to dismiss the operative complaint. They argue that (1) the court should dismiss any official capacity claims because those claims are properly against the township; (2) the plaintiff cannot maintain any claim related to the failure to read *Miranda* warnings because he does not allege that any statements were used against him at trial; (3) the court should dismiss any claims against the supervisors because there is no liability for *respondeat superior* in a section 1983 claim and he does not allege personal involvement by them; (4) the plaintiff failed to state a claim pertaining to the strip search; (5) the plaintiff cannot assert negligence/failure to protect claims relating to the force used to effect his arrest; (6) the plaintiff failed to state an equal protection claim because he failed to allege that he was treated differently from other similarly situated persons; (7) the court should strike any claim for declaratory relief because the plaintiff is only attempting to adjudicate past conduct; and (8) the defendants are entitled to qualified immunity insofar as the plaintiff has failed to state any claim for relief.

As discussed below, the court will grant in part and deny in part the motion to dismiss. The defendants' argument for dismissing the official capacity claims lacks merit because the plaintiff has not named the township as a defendant; nonetheless, the court must dismiss the claims under 28 U.S.C. § 1915(e)(2)(B)(ii) because he has failed to properly plead official capacity claims under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978). The court denies the motion to the extent it seeks dismissal of claims relating to the strip search because the defendants have not satisfied their burden to show the plaintiff has failed to plead a plausible claim and the plaintiff included sufficient allegations to maintain a supervisory

individual liability claim against two supervisors. Except as to a supervising officer and another officer for whom the plaintiff has failed to plead personal involvement, the court also denies the motion to the extent it seeks dismissal of an excessive force claim because (1) there is no indication that the plaintiff is seeking to maintain a state law claim, and (2) the fact that it appears that the plaintiff has pleaded guilty to resisting arrest does not necessarily preclude the claim at this stage. The court grants the motion insofar as the defendants seek dismissal of a claim for the failure to provide *Miranda* warnings because the plaintiff did not allege that he made any statements in response to the questions or that such statements were used against him at trial. The court also grants the motion to the extent it seeks dismissal of the equal protection claim because the plaintiff has not alleged that the defendant officer treated him differently than another similarly situated individual. The court further grants the motion to the extent the defendants ask the court to strike the claim for a declaratory judgment insofar as the plaintiff is seeking only a remedy for past conduct. Finally, the court will deny the motion to the extent that it seeks dismissal based on qualified immunity for the reasons already stated and because the court is providing the plaintiff with leave to file another amended complaint to possibly plead facts that would affect this court's qualified immunity analysis.

## I.     ALLEGATIONS AND PROCEDURAL HISTORY

The *pro se* plaintiff, Vincent Aienne Chapolini ("Chapolini"), filed an application for leave to proceed *in forma pauperis* (the "IFP Application"), a prisoner trust fund account statement, and a complaint that the clerk of court docketed on June 21, 2018. Doc. Nos. 1–3. The complaint named Anthony Capodanno ("Officer Capodanno"), Thomas Johnson ("Captain Johnson"), Kevin Donohue ("Officer Donohue"), and the Upper Darby Police Department

("UDPD") as defendants. Compl. at 1–3, Doc. No. 3. This court entered an order on June 26, 2018, which, *inter alia*, granted the IFP Application. Doc. No. 5.

Chapolini filed an application for the appointment of counsel and a motion for a default judgment, which the clerk of court docketed on July 27, 2018, and July 30, 2018, respectively. Doc. Nos. 13, 14. The court entered an order denying the motion for a default judgment on July 31, 2018. Doc. No. 15.

The defendants filed a motion to dismiss the complaint on August 15, 2018. Doc. No. 18. Chapolini, after receiving an extension of time to file a response to the motion to dismiss, filed a motion for leave to file an amended complaint that the clerk of court docketed on September 10, 2018. Doc. Nos. 19–23. The court granted the motion for leave to file an amended complaint on September 17, 2018, and Chapolini filed an amended complaint on October 2, 2018. Doc. Nos. 24, 25.

Chapolini filed an amended complaint on September 25, 2018.[1] Doc. No. 25. In the amended complaint, Chapolini removed the UDPD as a defendant and added James Flores ("Officer Flores"), Walter McDonald ("Officer McDonald"), and Glenn Gamber ("Officer Gamber") as defendants. Am. Compl. at 1. As for his allegations, Chapolini alleges the UDPD employed all defendants as police officers on March 1, 2018. *Id.* at ¶¶ 4–9. On that date, Chapolini entered the UDPD to "file a report a[bout] a fraud crime that was committed against [him], with [his] information and without [his] permission." *Id.* at ¶ 13. Chapolini then encountered Officer McDonald, who was acting as station security. *Id.* at ¶¶ 7, 13.

---

[1] The federal "prisoner mailbox rule" provides that a *pro se* prisoner's petition is deemed filed "at the time petitioner delivered it to the prison authorities for forwarding to the court clerk." *Houston v. Lack*, 487 U.S. 266, 275–76 (1988). Although the doctrine arose in the context of habeas corpus petitions, the Third Circuit has extended it to civil actions brought under 42 U.S.C. § 1983. *See Pearson v. Secretary Dep't of Corr.*, 775 F.3d 598, 600 n.2 (3d Cir. 2015) (applying rule in section 1983 action and determining that *pro se* prisoner plaintiff filed complaint on date he signed it). Here, Chapolini included a declaration with the amended complaint in which he states that he provided it to prison authorities on September 25, 2018, for mailing to the clerk of court. *See* Am. Compl. at 8, Doc. No. 25.

Officer McDonald was "very rude" to Chapolini and pretended to take his fraud report while he was checking Chapolini's personal information for any active warrants. *Id.* at ¶ 14. Chapolini waited for 15 minutes for a receipt of his fraud report, but Officer McDonald had determined that there were two active warrants for him pertaining to parole and probation violations. *Id.* at ¶ 15. At this point, Officer McDonald "ignored/neglected [Chapolini's] right to receive assistance from the [UDPD] and made [Chapolini] the target." *Id.*

While Chapolini was waiting, he began to talk on his cellphone and decided to "get some air." *Id.* at ¶ 16. He headed through the lobby door into the vestibule, when Officer Capodanno confronted him and told him that he was under arrest but did not tell him why he was under arrest. *Id.* Chapolini claims that he was unaware of the active warrants for his arrest and out of a fear for his wellbeing, ran (or tried to run), into the view of his employer, who had driven him to the police station so he could file the report, "in case anything wrong was to happen." *Id.* at ¶ 17.

After Chapolini reached the bottom of the vestibule steps, Officer Capodanno, Officer Donahue, and Captain Johnson "grabbed" him. *Id.* at ¶ 18. One of the officers grabbed Chapolini's left arm, another grabbed his right arm, and the last one grabbed his head. *Id.* One of these defendants "excessively slammed" Chapolini's head into the vestibule floor. *Id.* Chapolini suffered a "minor" injury to his head, left wrist, and left hand, and a "major" injury to his left rear shoulder. *Id.*

Officer Capodanno then moved Chapolini into a cell. *Id.* at ¶ 19. With the other defendants and UDPD employees watching through the cell window, Officer Capodanno began to strip search Chapolini down to his boxers. *Id.* Officer Capodanno "aggressively grabb[ed] [Chapolini's] testicles and between his anus [sic]." *Id.* The entire search occurred on an open circuit station security camera. *Id.*

Later, Chapolini repeatedly complained about the severe pain from his injuries, and medics came to examine him. *Id.* at ¶ 20. The medics determined that Chapolini needed immediate medical attention and he was transported to the Delaware Memorial Hospital for treatment. *Id.* After being treated there, he was released back to UDPD custody. *Id.* Once he was returned to the UDPD, Officer Capodanno informed him that the police were charging him with resisting arrest. *Id.* at ¶ 21. Chapolini requested an attorney, but Officer Capodanno said that Chapolini "had no rights." *Id.* Officer Capodanno also stated that he did not have to read *Miranda* warnings to Chapolini, and he proceeded to question him. *Id.*

Apparently, Chapolini is awaiting trial for a "retaliatory accusation of resisting arrest, with no reg[]ard to his [F]ifth [A]mendment constitutional rights." *Id.* at ¶ 22. Also, Officer Gamber "approved/cleared all video, report's [sic], note's [sic], concerning this matter." *Id.*

Based on these allegations, Chapolini asserts multiple causes of action. *Id.* at 6–7. His first cause of action is a substantive due process violation against Officer Capodanno for his deliberate indifference to Chapolini's health and safety when he strip-searched him in a public setting and on an open circuit camera which allowed unauthorized and individuals from the opposite sex to observe it. *Id.* at 6. The second cause of action is for "deficient management of subordinates," against Officer Gamber because he

> exercised deliberate indifference when he knowingly approved incident and incident of arrest reports, which documented [Chapolini's] constitutional right's [sic] were being violated, with being taken into custody without the plaintiff being issued a [*Miranda*] warning, in which [Officer] Gamber should've re-directed his subordinate [Officer] Capodanno to do so.

*Id.* Chapolini also asserts the same cause of action against Captain Johnson and Officer Gamber because they "fail[ed] to properly supervise [his] apprehension for his active warrant, which [their] negligence of their subordinates[] caused [his] injuries[, and they] poor[ly] supervis[ed] . .

. [his] unwarranted strip search." *Id.* Chapolini's third cause of action is an Equal Protection Clause claim against Officer McDonald because he "ignor[ed his] request to report a crime based on [his] appearance, prior and after . . . learning of [his] active parole/probation violation warrants." *Id.* at 6–7. Officer McDonald also "made [Chapolini] a target, victimizing [him]." *Id.* at 7. For his final cause of action, Chapolini asserts a cause of action for "negligence/failure to protect" against Officers Donahue and Flores because they "exercised deliberate indifference by using more force th[a]n necessary, causing [Chapolini's] injuries." *Id.*

Concerning his requests for relief, Chapolini seeks a judgment "in an amount sufficient to compensate him for the pain and mental anguish suffered by him due to the deliberate indifference and intentional misconduct of the defendants, but kindly in no event less than $200,000." *Id.* He also apparently seeks declaratory relief. *Id.*

The defendants filed a motion to dismiss the amended complaint on October 4, 2018. Doc. No. 27. Chapolini filed a response to the motion to dismiss that the clerk of court docketed on October 18, 2018. Doc. No. 28. Chapolini then filed a "Request for Defendants['] Conduct Files (Motion of [sic] Discovery)" that the clerk of court docketed on December 10, 2018. Doc. No. 29. The defendants filed a response to the motion for discovery on December 17, 2018. Doc. No. 30. Chapolini filed a notice of change of address on February 14, 2019. Doc. No. 31. This court entered an order denying the motion to dismiss the original complaint as moot on March 6, 2019. Doc. No. 32.

## II. DISCUSSION

### A. <u>Standards of Review</u>

#### 1. Motion to Dismiss Under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for dismissal of a complaint or a portion of a complaint for failure to state a claim upon which relief can be

granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests "the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (citation omitted). As the moving party, "[t]he defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted).

In general, a complaint is legally sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "The touchstone of [this] pleading standard is plausibility." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Although Rule 8(a)(2) does "not require heightened fact pleading of specifics," it does require the recitation of "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In other words, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quotation omitted). "In ruling on a 12(b)(6) motion, courts can and should reject legal conclusions, unsupported conclusions, unwarranted references, unwarranted deductions, footless conclusions of law, and sweeping legal conclusions in the form of actual allegations." *Bright v. Westmoreland Cty.*, 380 F.3d 729, 735 (3d Cir. 2004) (citation and internal quotation marks omitted). Ultimately, a complaint must contain facts sufficient to nudge any claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In addressing whether a *pro se* plaintiff's complaint fails to state a claim, the court must liberally construe the allegations set forth in the complaint. *See Higgs v. Att'y Gen.*, 655 F.3d

333, 339–40 (3d Cir. 2011) (explaining that "when presented with a *pro se* litigant, we have a special obligation to construe his complaint liberally" (citation and internal quotation marks omitted)). Also, "[t]he defendant bears the burden of showing that no claim has been presented." *Hedges*, 404 F.3d at 750 (citation omitted).

## 2. Review Under 28 U.S.C. § 1915(e)(2)

Because the court has granted Chapolini leave to proceed *in forma pauperis*, the court must examine whether the amended complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or asserts a claim against a defendant immune from monetary relief. *See* 28 U.S.C. § 1915(e)(2)(B)(i)–(iii) (providing that "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that-- . . . **(B)** the action or appeal—**(i)** is frivolous or malicious; **(ii)** fails to state a claim on which relief may be granted; or **(iii)** seeks monetary relief against a defendant who is immune from such relief"). A complaint is frivolous under section 1915(e)(2)(B)(i) if it "lacks an arguable basis either in law or fact," *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), and is legally baseless if it is "based on an indisputably meritless legal theory." *Deutsch v. United States*, 67 F.3d 1080, 1085 (3d Cir. 1995). As for whether a complaint is malicious,

> [a] court that considers whether an action is malicious must, in accordance with the definition of the term "malicious," engage in a subjective inquiry into the litigant's motivations at the time of the filing of the lawsuit to determine whether the action is an attempt to vex, injure or harass the defendant.

*Id.* at 1086. "[A] district court may dismiss a complaint as malicious if it is plainly abusive of the judicial process or merely repeats pending or previously litigated claims." *Brodzki v. CBS Sports*, Civ. No. 11-841-SLR, 2012 WL 125281, at *1 (D. Del. Jan. 13, 2012).

Concerning the analysis under section 1915(e)(2)(B)(ii), the standard for dismissing a complaint for failure to state a claim pursuant to this subsection is identical to the legal standard

used when ruling on motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999) (applying Rule 12(b)(6) standard to dismissal for failure to state claim under section 1915(e)(2)(B)).

## B.    Analysis

In the motion to dismiss, the defendants argue that the court should dismiss with prejudice (1) the official capacity claims against them because those claims are essentially against the government entity; (2) the substantive due process claim against Officer Capodanno because (a) there is no cause of action for a failure to administer *Miranda* warnings after the police arrested Chapolini because he does not claim that any statements acquired were used against him at trial, and (b) Chapolini has not alleged that the strip search was not a routine intake procedure at the UDPD; (3) the "Deficient Management of Subordinates" claim against Officer Gamber because (a) he cannot be held liable for simply being the supervisor, and (b) the failure-to-provide-*Miranda*-warnings claim lacks merit; (4) the "Deficient Management of Subordinates" claim against Captain Johnson because, *inter alia*, there are no allegations of personal involvement; (5) the Equal Protection Clause claim against Officer McDonald because Chapolini does not allege (a) what it was about his appearance that caused Officer McDonald to treat him differently, or (b) the existence of similarly situated persons that have been treated differently; and (6) the "negligence/failure to protect" claims against Officers Donahue and Flores because (a) the Political Subdivision Torts Claims Act bars any negligence claim, (b) Chapolini has not alleged that the defendants intentionally caused his injuries. Defs.' Mot. to Dismiss Pl.'s Am. Compl. Pursuant to Fed. Rules of Civ. P. 12(b)(6) and Rule 12(e) ("Defs.' Mem.") at 5–11, Doc. No. 27. The defendants also argue that they are entitled to qualified

immunity and that the court should strike Chapolini's request for a declaratory judgment. *Id.* at 10–11. The court addresses each of these arguments in turn.

### 1.    Chapolini's Official Capacity Claims

The defendants assert that the court should dismiss any official capacity claims against them because "suits against state officers in their official capacity are merely another way of pleading an action against the entity of which an officer is an agent." *Id.* at 5 (citations omitted). Although Chapolini did not respond to this argument in his response to the motion to dismiss, it does not provide a ground for dismissal of the official capacity claims.

A plaintiff suing under section 1983 can assert claims against individuals in their individual and official capacities. Individual capacity claims under section 1983 "seek to recover money from a government official, as an individual, for acts performed under color of state law." *Gregory v. Chehi*, 843 F.2d 111, 120 (3d Cir. 1988). Official capacity claims "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell*, 436 U.S. at 690 n.55 (1978)). "A judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents[.]" *Brandon v. Holt*, 469 U.S. 464, 471 (1985). Courts in this district have dismissed official capacity claims against individual defendants when the plaintiff has sued both the governmental entity and officers of that governmental entity because the official capacity claims are redundant in that scenario. *See McDonald-Witherspoon v. City of Phila.*, Civ. A. No. 17-1914, 2018 WL 4030702, at *5 (E.D. Pa. Aug. 23, 2018) (dismissing official capacity claims against city officials where defendants asserted that they were "identical to the § 1983 claim made against the City" because "[i]t is unnecessary for Plaintiff to pursue to the same claim against the same party in interest under a different name"); *Jackson v. Phila. Housing*

*Auth.*, Civ. A. No. 13-4872, 2014 WL 1096157, at *4 (E.D. Pa. Mar. 20, 2014) ("Where the plaintiff sues both the governmental entity and the entity's officers in their official capacities, the official capacity suits are duplicative of the suit against the entity and should be dismissed." (citations omitted)); *see also Gregory*, 843 F.2d at 120 ("[T]he claims here, insofar as they are against the defendant officials in their official capacities, are only a duplication of the counts asserted against the Township itself.").

Here, unlike in the original complaint, Chapolini has identified only the individual UDPD officers and not Upper Darby Township (or the UDPD) as defendants.[2] *Compare* Compl. at 1, *with* Am. Compl. at 1. The defendants have not cited to any case where a court has dismissed official capacity claims against individual defendants where the government entity is not named as a defendant, simply because the claims are the types of claims that could be asserted against the governmental entity. Therefore, the defendants' argument does not warrant dismissal.

Nonetheless, the court has screened Chapolini's official capacity claims under 28 U.S.C. § 1915(e)(2). Because Chapolini is pursuing official capacity claims against the individual defendants, he is essentially asserting *Monell* claims. *See Thomas v. City of Chester*, Civ. A. No. 15-3955, 2016 WL 1106900, at *2 (E.D. Pa. Mar. 21, 2016) ("A suit for damages against an individual municipal employee in his or her 'official capacity' is not cognizable unless the requirements of *Monell* are met." (citation omitted)); *see also McHugh*, 2015 WL 9489593, at *9

---

[2] Chapolini seemingly would not have been able to maintain a claim against the UDPD had he chosen to keep it as a defendant in this lawsuit. *See Mikhaeil v. Santos*, 646 F. App'x 158, 163 (3d Cir. 2016) (per curiam) (concluding that district court "correctly determined that the Jersey City Police Department was not a proper party to this [section 1983] action [because] . . . a city police department is a governmental sub-unit that is not distinct from the municipality of which it is a part"). Additionally, he would not have been able to maintain the claim against the UDPD had he sued both it and Upper Darby Township. *See McHugh v. Koons*, Civ. A. No. 14-7165, 2015 WL 9489593, at *9 (E.D. Pa. Dec. 30, 2015) ("It is well settled in the Third Circuit that 'police departments cannot be sued in conjunction with municipalities, because the police department is merely an administrative arm of the local municipality, and is not a separate judicial entity.'" (citations omitted)).

("An official capacity suit against a prosecutor is essentially a municipal liability claim against the District Attorney's Office[] pursuant to *Monell*.").

Regarding *Monell* liability of municipalities and local governments under section 1983, they

> may be liable . . . if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. See *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (citing *Monell*, 436 U.S., at 665–683, 98 S.Ct. 2018). They are not vicariously liable under § 1983 for their employee's actions. See *id.*, at 691, 98 S.Ct. 2018; *Canton*[ *v. Harris*, 489 U.S. 378, 392, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989);] *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (collecting cases).
>
> Plaintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury. *Monell*, 436 U.S., at 691, 98 S.Ct. 2018; see *id.*, at 694, 98 S.Ct. 2018. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. See *ibid.*; *Pembaur*, *supra*, at 480–481, 106 S.Ct. 1292; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–168, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). These are "action[s] for which the municipality is actually responsible." *Pembaur*, *supra*, at 479–480, 106 S.Ct. 1292.

*Connick v. Thompson*, 563 U.S. 51, 60–61 (2011) (last alteration in original).

Under *Monell*, a plaintiff may hold a municipality liable under section 1983 only where the plaintiff establishes that (1) the municipality had a policy, custom or practice, (2) the policy, custom, or practice amounted to deliberate indifference to the plaintiff's constitutional rights, and (3) the policy was the moving force behind the constitutional violation. *See Vargas v. City of Phila.*, 783 F.3d 962, 974 (3d Cir. 2015) (citing *Monell*, 436 U.S. at 389–91). A "policy" arises when a decision-maker possessing final authority issues an official proclamation, policy, or edict. *Pembaur*, 475 U.S. at 481. "Customs" are practices so permanent and well settled as to

virtually constitute law. *Monell*, 436 U.S. at 691. Regardless of whether a plaintiff is seeking to impose *Monell* liability for a policy or a custom, "it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990); *see also Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (explaining that in both methods to obtain liability under *Monell*, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom").

Here, Chapolini has not identified any policy, custom, or practice in the amended complaint that would possibly establish *Monell* liability.[3] He has not alleged that the UDPD has a policy, custom, or practice of using excessive force when effecting an arrest, unconstitutionally strip searching individuals after their arrests, or failing to read *Miranda* warnings before conducting custodial interrogations. As such, he has not included allegations to maintain official capacity claims against the defendants and the court will dismiss those claims under 28 U.S.C. § 1915(e)(2)(B)(ii).

---

[3] Although Chapolini has identified Officer Gamber and Captain Johnson as supervisors in the amended complaint, he does not include any allegations that they, or any of the other defendants, are policymakers. Courts have dismissed official capacity claims against individual defendants when (1) there are no allegations that they are policymakers or (2) the nature of their positions would not constitute policymakers as a matter of state law. *See, e.g.*, *McHugh*, 2015 WL 9489593, at *9 (dismissing official capacity claim against prosecutor because he did "not have policymaking authority for the District Attorney's Office"); *Kis v. Cty. of Schuylkill*, 866 F. Supp. 1462, 1479 (E.D. Pa. 1994) ("The Supreme Court has clearly stated that only those municipal officers and employees who have final policymaking authority can by their actions subject their municipal employers to § 1983 liability."). There is no indication that under Pennsylvania state law that any of the individual defendants is a policymaker as even the UDPD police chief would not be a policymaker under Pennsylvania law. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 135 n.11 (3d Cir. 2010) (explaining that "as a matter of Pennsylvania state law, a township Police Chief is not a final policymaker" (citing 53 Pa. C.S. § 66902)).

## 2. Chapolini's Fourth Amendment Claim Against Capodanno for the Strip Search

Chapolini claims that Officer Capodanno violated his constitutional rights by strip-searching him at the UDPD.[4] Chapolini alleges that he had to strip down to his boxers, and Officer Capodanno, while the other defendants watched and while he was being recorded by a security camera, aggressively grabbed his testicles and "between his anus [sic]." Am. Compl. at ¶ 19. He also claims that the security camera was "an open circuit camera," which allowed "unauthorized and opposite sex people to see [him]." *Id.* at ¶ 24.

The defendants contend that "[t]here is no viable claim against Officer Capodanno based upon allegations of a strip search and body cavity search when he was arrested on probation/parole warrants and for resisting arrest." Defs.' Mem. at 6 (citing *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318 (2012) and *J.B. v. Fassnacht*, 801 F.3d 336 (3d Cir. 2015)). Unfortunately, Chapolini does not substantively respond to this argument; instead, he references that the strip search was "intrusive" and constituted a "cavity search." Reply to Defs.' Mot. to Dismiss and Request for Time Extension ("Pl.'s Resp.") at 2, 3, Doc. No. 28. Despite Chapolini's lack of a substantive response, the defendants' argument does not warrant relief.

Section 1983 "provides private citizens with a means to redress violations of federal law committed by state individuals." *Woodyard v. Cty. of Essex*, 514 F. App'x 177, 180 (3d Cir.

---

[4] Although Chapolini claims that Officer Capodanno violated his substantive due process rights, such a claim relating to a strip search conducted after his arrest arises under the Fourth Amendment. *See Alibright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see, e.g.*, *Peterson v. Pitts*, Civ. A. No. 18-1691, 2019 WL 3836497, at *2 n.3 (E.D. Pa. Aug. 14, 2019) ("Though Peterson's Complaint references the Fourteenth Amendment, the Court analyzes his claim under the Fourth Amendment, consistent with the United States Supreme Court's holding in *Albright* . . . ." (internal citation omitted)). To prevail on this claim, Chapolini will have to prove that the search was conducted in an unreasonable manner. *See Bell*, 441 U.S. at 560 (explaining body cavity search does not violate Fourth Amendment rights of pretrial detainees where search is "conducted in a reasonable manner").

2013) (per curiam) (citing 42 U.S.C. § 1983). "[A] plaintiff seeking to hold an individual liable under § 1983 must establish that she was deprived of a federal constitutional or statutory right by a state actor." *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (citing *Benn v. Universal Health Sys.*, 371 F.3d 165, 169–70 (3d Cir. 2004)). "Accordingly, there can be no cause of action under § 1983 absent violation of a right secured by the Constitution or the laws of the United States." *Reichley v. Pennsylvania Dep't of Agric.*, 427 F.3d 236, 244 (3d Cir. 2005).

When evaluating section 1983 claims,

> "[t]he first step . . . is to identify the exact contours of the underlying right said to have been violated and to determine whether the plaintiff has alleged a deprivation of a constitutional right at all." *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5, 118 S.Ct. 1708, 1714 n.5, 140 L.Ed.2d 1043 (1998)). Next, a plaintiff must demonstrate a defendant's "personal involvement in the alleged wrongs." *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988). A plaintiff makes sufficient allegations of a defendant's personal involvement by describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct. *Id.* Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive. *Baker v. Monroe Twp.,* 50 F.3d 1186, 1194 (3d Cir. 1995); *Rode,* 845 F.2d at 1201 n.6. A plaintiff "must portray specific conduct by state officials which violates some constitutional right." *Gittlemacker v. Prasse,* 428 F.2d 1, 3 (3d Cir. 1970).

*Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015).

In this case, Chapolini alleges that Officer Capodanno placed him in a cell in the police station to strip search him. It is unclear from the amended complaint whether the cell was the location where the police were placing Chapolini to hold him (possibly until he was transported for a preliminary arraignment before a magisterial district justice), or if it was merely the location in which Officer Capodanno decided to strip search him. Nonetheless, neither *Florence* nor *Fassnacht* expressly apply to the situation presented here, namely, a strip search occurring in a police station.

In *Florence*, police stopped the petitioner's vehicle and later determined during the stop that there was a bench warrant for the petitioner's arrest.[5] 566 U.S. at 323. The police arrested the petitioner and took him to a county detention center. *Id.* While there, he had to shower with a delousing agent, corrections officers checked him for scars, marks, gang tattoos, and contraband as he disrobed, and corrections officers "instructed [him] to open his mouth, lift his tongue, hold out his arms, turn around, and lift his genitals." *Id.* The petitioner remained at this detention center for six days, until corrections officials transferred to the county correctional facility associated with the bench warrant. *Id.* at 323–24.

At this county correctional facility,

> all arriving detainees passed through a metal detector and waited in a group holding cell for a more thorough search. When they left the holding cell, they were instructed to remove their clothing while an officer looked for body markings, wounds, and contraband. Apparently without touching the detainees, an officer looked at their ears, nose, mouth, hair, scalp, fingers, hands, arms, armpits, and other body openings. This policy applied regardless of the circumstances of the arrest, the suspected offense, or the detainee's behavior, demeanor, or criminal history.

*Id.* at 324. The petitioner also alleged that "he was required to lift his genitals, turn around, and cough in a squatting position as part of the process. After a mandatory shower, during which his clothes were inspected, [he] was admitted to the facility." *Id.* The petitioner remained at this second facility until the following day, when his charges were dismissed. *Id.*

The petitioner "sued the governmental entities that operated the jails, one of the wardens, and certain other defendants." *Id.* He claimed that these defendants violated his Fourth and Fourteenth Amendment rights because

> persons arrested for a minor offense could not be required to remove their clothing and expose the most private areas of their bodies to close visual

---

[5] The bench warrant was issued after the petitioner fell behind on his monthly payments toward a fine imposed after he pleaded guilty to two offenses. 566 U.S. at 323. Although the petitioner promptly paid the outstanding balance, "for some unexplained reason, the warrant remained in a statewide computer database." *Id.*

> inspection as a routine part of the intake process. Rather, . . . officials could conduct this kind of search only if they had reason to suspect a particular inmate of concealing a weapon, drugs, or other contraband.

*Id.* (internal citation omitted). The district court "certified a class of individuals who were charged with a nonindictable offense under New Jersey law, processed at either the Burlington County or Essex County jail, and directed to strip naked even though an officer had not articulated any reasonable suspicion they were concealing contraband." *Id.* at 324–25. The district court granted summary judgment in favor of the petitioner, "conclud[ing] that any policy of 'strip searching' nonindictable offenders without reasonable suspicion violated the Fourth Amendment." *Id.* at 325. The Third Circuit reversed, "holding that the procedures described by the District Court struck a reasonable balance between inmate privacy and the security needs of the two jails." *Id.*

On appeal to the Supreme Court, the Court addressed "the controversy [over] whether every detainee who will be admitted to the general population [of a prison or other detention facility] may be required to undergo a close visual inspection while undressed."[6] *Id.* at 322. In addressing this issue, the Court pointed out that it "has confirmed the importance of deference to correctional officials and explained that a regulation impinging on an inmate's constitutional rights must be upheld if it is reasonably related to legitimate penological interests." *Id.* at 326 (citations and internal quotation marks omitted). This "deference must be given to the officials in

---

[6] The Court discussed the use of the term "strip search" to describe what occurred in the correctional facilities:

> The opinions in earlier proceedings, the briefs on file, and some cases of this Court refer to a "strip search." The term is imprecise. It may refer simply to the instruction to remove clothing while an officer observes from a distance of, say, five feet or more; it may mean a visual inspection from a closer, more uncomfortable distance; it may include directing detainees to shake their heads or to run their hands through their hair to dislodge what might be hidden there; or it may involve instructions to raise arms, to display foot insteps, to expose the back of the ears, to move or spread the buttocks or genital areas, or to cough in a squatting position. In the instant case, the term does not include any touching of unclothed areas by the inspecting officer. There are no allegations that the detainees here were touched in any way as part of the searches.

566 U.S. at 325.

charge of the jail unless there is 'substantial evidence' demonstrating their response to the situation is exaggerated." *Id.* at 330 (citation omitted).

The Court then went through the justifications for the procedures used by the two correctional facilities and found that the petitioner did not show substantial evidence that the officials' response to the situation was exaggerated. Regarding these justifications, the Court explained that, *inter alia*, (1) "[c]orrectional officials have a significant interest in conducting a thorough search as a standard part of the intake process [because t]he admission of inmates creates numerous risks for facility staff, for the existing detainee population, and for a new detainee himself or herself[,]" (2) "[j]ails and prisons also face grave threats posed by the increasing number of gang members who go through the intake process . . . [thus, t]he identification and isolation of gang members before they are admitted protects everyone in the facility[,]" and (3) "[d]etecting contraband concealed by new detainees . . . is a most serious responsibility [as w]eapons, drugs, and alcohol all disrupt the safe operation of a jail."[7] *Id.* at 331–33 (citations omitted). In total, the Court determined that "[t]here is a substantial interest in preventing any new inmate, either of his own will or as a result of coercion, from putting all who live or work at these institutions at even greater risk when he is admitted to the general population." *Id.* at 333–34.

The Court then addressed the petitioner's argument that the seriousness of the offense should play a role in whether an incoming inmate is subjected to the visual search. *Id.* at 334. The Court explained that "[p]eople detained for minor offenses can turn out to be the most devious and dangerous criminals." *Id.* Also, "[e]xperience show[ed] that people arrested for minor offenses have tried to smuggle prohibited items into jail, sometimes by using their rectal

---

[7] The Court pointed out that "contraband" for correctional facility purposes went beyond knives, guns, and illicit drugs to include scissors, razor blades, glass shards, money, cigarettes, certain items of clothing, lighters, matches, cell phones, pills and medications, chewing gum, hairpins, wigs, and even pens. 566 U.S. at 332–33.

cavities or genitals for the concealment." *Id.* at 335. Further, "[e]ven if people arrested for a minor offense do not themselves wish to introduce contraband into a jail, they may be coerced into doing so by others." *Id.* (citation omitted). Moreover, a correctional facility may have difficulties with classifying inmates by their current offenses and criminal history prior to the intake search. *Id.* at 336. At bottom, "[t]he restrictions suggested by petitioner would limit the intrusion on the privacy of some detainees but at the risk of increased danger to everyone in the facility, including the less serious offenders themselves." *Id.* at 338.

Of importance to the instant case, the Court emphasized that "[t]his case does not require the Court to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees." *Id.* at 338–39. The court noted that "[t]he accommodations provided in these situations may diminish the need to conduct some aspects of the searches at issue." *Id.* at 339 (citation omitted). In addition, the case did not permit the Court to address "whether an arrestee whose detention has not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general population, may be subjected to the types of searches at issue here." *Id.* The Court also did not address "the invasiveness of searches that involve the touching of detainees," because only visual searches were involved in the case. *Id.*

Justice Alito wrote a concurring opinion to "emphasize the limits of [the majority's] holding. *Id.* at 340 (Alito, J., concurring). He described the holding as follows:

> Jail administrators may require all arrestees *who are committed to the general population of a jail* to undergo visual strip searches not involving physical contact by corrections officers. To perform the searches, officers may direct the arrestees to disrobe, shower, and submit to a visual inspection. As part of the inspection, the arrestees may be required to manipulate their bodies.

*Id.* at 340–41. He then explained

> that the Court does not hold that it is *always* reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population. Most of those arrested for minor offenses are not dangerous, and most are released from custody prior to or at the time of their initial appearance before a magistrate. In some cases, the charges are dropped. In others, arrestees are released either on their own recognizance or on minimal bail. In the end, few are sentenced to incarceration. For these persons, admission to the general jail population, with the concomitant humiliation of a strip search, may not be reasonable, particularly if an alternative procedure is feasible.

*Id.* at 341–42.

As illustrated by this court's lengthy discussion of *Florence*, the *Florence* Court did not address the circumstances presented here: a physical (not simply visual) strip search of an individual after the individual's arrest, at a police station, prior to any determination by a magistrate regarding the individual's confinement. There is no indication that the Court's application of the holding to "a jail or other detention facility" would apply to the UDPD. *See, e.g.*, *Fate v. Charles*, 24 F. Supp. 3d 337 (S.D.N.Y. 2014) (concluding that "*Florence* does not permit the suspicionless visual body cavity search at issue in this case[,]" which occurred in police station). Justice Alito's concurring opinion emphasized that the majority's holding was limited to inmates committed to the general population of a jail. *Id.* at 340. There are no allegations that Officer Capodanno searched Chapolini because he was about to be committed to the general population of a jail.

In the other case cited by the defendants, *Fassnacht*, the minor plaintiff was strip-searched upon his arrival at a county youth intervention center. 801 F.3d at 338. During the search, the minor remained behind a curtain so that only the officer performing the search could view him. *Id.* The minor had to "turn around, drop his pants and underwear, bend over, spread his buttocks, and cough." *Id.*

The minor plaintiff's parents filed an action under section 1983, claiming that, *inter alia*, the officials at the youth detention center subjected the minor to an unreasonable search. *Id.* In resolving motions for summary judgment, the district court concluded that *Florence* does not apply to juveniles (and denied the defendants' motion for summary judgment on that ground) and analyzed the search under the reasonable suspicion standard articulated in *Bell v. Wolfish*, 441 U.S. 520 (1979). *Id.* The district court also certified the "question of whether *Florence* applies to all juveniles being committed to a juvenile detention facility." *Id.* at 339. The Third Circuit reviewed *Florence*, concluded that the decision applied to juvenile detainees, and reversed the district court. *Id.* at 347.

The court cannot discern why the defendants are citing to *Fassnacht* as it does not appear that Chapolini is a juvenile and *Fassnacht* is only relevant insofar as the Third Circuit extended *Florence* to juvenile detainees. Nonetheless, the same issues exist. At this stage of the case, the court is limited to the allegations in the amended complaint, and it does not appear at this stage that either *Florence* or *Fassnacht* are applicable. Accordingly, as those are the only grounds asserted for dismissing Officer Capodanno from Chapolini's claim concerning the strip search, the court must deny this part of the motion.[8] *See Hedges*, 404 F.3d at 750 ("The defendant bears the burden of showing that no claim has been presented." (citation omitted)).

### 3.     Failure to Supervise Claim Against Officer Gamber Relating to the Failure to Read *Miranda* Warnings

Although Chapolini complains about Officer Capodanno questioning him without first providing *Miranda* warnings to him, he does not assert a cause of action against him in the amended complaint. Instead, his only cause of action relating to the alleged failure to read

---

[8] The court also notes that the defendants have ignored another part of Chapolini's claim as he clearly alleges that the way the search was performed also violated his rights. *See* Am. Compl. at ¶ 19 (complaining that Officer Capodanno aggressively grabbed his testicles and "between his anus [sic]").

*Miranda* warnings before questioning him is a supervisory liability claim against Officer Gamber. Am. Compl. at ¶ 26. The defendants move to dismiss this claim because (1) there is no right to *Miranda* warnings where no statement is taken, (2) Chapolini has not alleged that a statement was taken or that it was used against him, (3) simply because Officer Gamber approved a report stating that the UDPD did not give Chapolini *Miranda* warnings does not show that he had knowledge that such warnings were necessary in this case, and (4) Officer Gamber cannot be held liable simply for being a supervisor. Defs.' Mem. at 6–7. Chapolini asserts in response that "[w]hen [Officers Capodanno and Donahue] both asked [him] why he ran briefly, [his] rights were violated," and a "defective management claim is very much proper" where Officer Gamber "filed [an] incident report which clearly states that no [*Miranda*] was [sic] issued." Pl.'s Resp. at 3. The court agrees with the defendants that this claim is properly dismissed.

As Chapolini asserts that Officer Gamber is a supervisor, he must allege that Officer Gamber's own conduct violated the Constitution. *See Iqbal*, 556 U.S. at 676 (explaining that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* There are two theories of supervisory liability when a plaintiff seeks to hold a supervisor liable for the unconstitutional acts by subordinates: (1) "Individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm[;]" and (2) "[A] supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates'

violations." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (citation omitted). Here, the court has already explained that Chapolini has not included any allegations that any of the defendants are policymakers, it appears very likely that none of the defendants are policymakers under Pennsylvania law, and there are no allegations regarding the establishment or maintenance of a policy, practice or custom. As such, the first theory of supervisor liability is inapplicable here. Concerning the second theory, Chapolini has also failed to include sufficient allegations for a plausible personal liability claim against Officer Gamber.

The Supreme Court has directed that law enforcement officers must provide a suspect with specific warnings of the suspect's Fifth Amendment rights prior to a "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A "custodial interrogation" is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* An "interrogation" under *Miranda* "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

Here, taking Chapolini's allegations as true, Officer Capodanno at least attempted to conduct a custodial interrogation of him without first providing him with *Miranda* warnings. Chapolini appears to believe that this failure entitles him to relief. *See* Pl.'s Resp. at 3. Chapolini is mistaken, as "questioning a plaintiff in custody without providing *Miranda* warnings is not a basis for a § 1983 claim as long as the plaintiff's statements are not used against [the plaintiff] at trial." *Renda v. King*, 347 F.3d 550, 557–58 (3d Cir. 2003); *King v. Cavallo*, Civ. A. No. 19-1005, 2019 WL 2246803, at *5, n.5 (E.D. Pa. May 22, 2019) ("King also alleges that Cavallo failed to provide him *Miranda* warnings. That allegation does not state a constitutional claim

because King does not also allege that he made statements during a custodial interrogation that were used against him at trial.").[9] Here, Chapolini does not allege that he responded to any of Officer Capodanno's questions, much less that any statements he made in response to Officer Capodanno were used against him at trial.[10] Accordingly, there is no claim generally for the failure to provide *Miranda* warnings here.

As for Officer Gamber, there are no allegations in the amended complaint that Officer Gamber participated in questioning Chapolini or directed Officer Capodanno to question Chapolini without first reading him *Miranda* warnings. In addition, even if Officer Gamber completed the incident report after the fact which indicates that Chapolini did not receive *Miranda* warnings and that he was "interviewed," there are no allegations in the amended complaint that he had any knowledge of a violation and otherwise failed to act to prevent them.

---

[9] The Third Circuit has also discussed the failure to provide *Miranda* warnings in relation to a section 1983 claim as follows:

> [V]iolations of the prophylactic *Miranda* procedures do not amount to violations of the Constitution itself. The right protected under the Fifth Amendment is the right not to be compelled to be a witness against oneself in a criminal prosecution, whereas the "right to counsel" during custodial interrogation recognized in *Miranda* . . . is merely a procedural safeguard, and not a substantive right.

*Giuffre v. Bissell*, 31 F.3d 1241, 1256 (3d Cir. 1994) (internal citations omitted).

[10] The incident reports Chapolini attached to his original complaint and his responsive brief do not reference him making a statement to the police. *See* Pl.'s Resp. at ECF pp. 9–11.

Regarding these documents, Chapolini attached a variety of documents to the original complaint pertaining to his allegations, including grievance forms, passes that required corrections officials to assign him to the bottom bunk in his cell, a photograph of his head that allegedly showed the injuries he received during his arrest, and a UDPD Incident Arrest Report and Incident Report pertaining to what occurred on March 1, 2018. Compl. at ECF pp. 14–32. Chapolini did not attach any of these documents to the amended complaint, but the court has referred to them in this opinion because he discusses the Incident Report and Incident Arrest Report in the amended complaint. *See In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) (explaining that along with allegations in complaint, court "can consider a document integral to or explicitly relied upon in the complaint," and "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." (emphasis in original) (internal quotation marks omitted)).

In the Incident Arrest Report (which looks like a form report), it states that Chapolini was not advised of his rights. Compl. at ECF p. 28. The Incident Report showed that Officers Capodanno, Donohue, Flores, and Finnegan, and Captain Johnson were involved in the incident. *Id.* at ECF p. 29. It also states that Chapolini was "Interviewed", he was not advised of his rights, and no statement was taken from him. *Id.* at ECF pp. 29, 30. It further states that Officer Gamber reviewed the report. *Id.* at ECF p. 29.

Moreover, as Chapolini has not pleaded a violation of his rights against Officer Capodanno, "his claims for . . . supervisory liability must also fail." *Riggins v. Banos*, Civ. No. 18-12877 (FLW)(LHG), 2019 WL 1916207, at *5 (D.N.J. Apr. 30, 2019) (citations omitted). Accordingly, Chapolini has failed to plausibly plead a supervisory liability, personal liability claim against Officer Gamber for the alleged failure to read him *Miranda* warnings.

### 4. Excessive Force Claims Against Officers Donahue and Flores

The defendants claim that the court should dismiss any claims by Chapolini regarding the force used to effect his arrest. Defs.' Mem. at 8. The defendants, presumably because Chapolini used the label "negligence/failure to protect" to reference his cause of action relating to his actual arrest, believe that he is asserting a negligence claim. *Id.* at 8–10. In characterizing Chapolini's claim as a negligence claim, the defendants assert that, to the extent he is asserting a state law cause of action for negligence, the Political Subdivision Torts Claim Act, 42 Pa. C.S. § 8541, *et seq.* ("PSTCA") provides Officers Donahue and Flores with immunity from this claim. *Id.* at 8–9. They also contend that Chapolini concedes that his injuries are not due to intentional conduct; therefore, they could not be liable for willful misconduct (as an exception to immunity under the PSTCA) under state law. *Id.* at 9–10. Finally, the defendants appear to assert that because Chapolini admits to running away from the police and not voluntarily submitting to the police, he can not assert a claim against the officers. *Id.* at 10.

In response to this argument, Chapolini appears to assert that he has asserted an excessive force claim against Officers Capodanno and Flores. Pl.'s Resp. at 4. He argues that even though he failed to follow Officer Capodanno's order to place his hands behind his back, Officer Capodanno still had to "conduct himself in the safest way that wouldn't injure either party." *Id.* (citing *Corselli v. Coughlin*, 842 F.2d 23, 27 (2d Cir. 1988)).

The court understands why the defendants have discussed negligence because the amended complaint states that Captain Thomas and Officer Gamber were negligent when they failed to properly supervise their subordinates when they apprehended him for his active warrant. Am. Compl. at ¶ 27. Chapolini also describes his cause of action relating to his arrest as a claim for "negligence/failure to protect." *Id.* at 7. Nonetheless, it is evident from the amended complaint that Chapolini is alleging that the officers used excessive force in arresting him and that he is asserting a section 1983 claim for the use of excessive force and not a state law negligence claim (or any other claim under state law). This court is obligated to "liberally construe" the amended complaint and "apply the applicable law, irrespective of whether the *pro se* litigant has mentioned it by name." *Dluhos v. Strasburg*, 321 F.3d 365, 369 (3d Cir. 2003) (citing *Higgins v. Beyer*, 293 F.3d 683, 688 (3d Cir. 2002)). As such, the court must analyze the claim as an excessive force claim.[11]

---

[11] To the extent that Chapolini would have sought to assert a negligence claim, the defendants are correct that the PSTCA would bar such a claim. Under the PSTCA,

> [a]n employee of a local agency is liable for civil damages on account of any injury to a person or property caused by acts of the employee which are within the scope of his office or duties only to the same extent as his employing local agency and subject to the limitations imposed by this subchapter.

42 Pa. C.S. § 8545. As for local agency liability, "[e]xcept as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. C.S. § 8541. The only exceptions to the PSTCA's prohibition on liability for negligent acts committed by local agency employees in their "scope of his office or duties" are: (1) vehicle liability; (2) care, custody, or control of personal property; (3) real property; (4) trees, traffic controls, and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; and (8) the care, custody, or control of animals. 42 Pa. C.S. § 8542(a), (b). None of these exceptions are applicable here.

As noted by the defendants, PSTCA immunity "does not extend to acts that are judicially determined to be crimes, actual fraud, actual malice, or willful misconduct." *Renk v. City of Pittsburgh*, 641 A.2d 289, 292 (Pa. 1994) (citing 42 Pa. C.S. § 8550)). Here, it is unclear whether the allegations arise to actual malice, but willful misconduct could possibly be at issue. "Although willful misconduct is generally synonymous with the term intentional tort, a different standard applies to police officers." *Salaam v. Wolfe*, Civ. A. No. 14-2055, 2019 WL 3889745, at *5 (E.D. Pa. Aug. 19, 2019) (citations and internal quotation marks omitted).

Regarding the use of force by police officers,

> [a] police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty. In making a lawful arrest, a police officer may use such force as is necessary under the circumstances to effectuate the arrest. The reasonableness of the

As almost all the defendants' arguments are mistakenly premised on Chapolini asserting

claims of negligence, they do not warrant any relief. The only argument that potentially relates to

a section 1983 excessive force claim (but is not specified as such and lacks citation to any

caselaw) appears to be their contention that Chapolini's conduct in fleeing and resisting arrest

negates any claim for excessive force. *See* Defs.' Mem. at 10 ("In this case, although the plaintiff

suggests that the force was unnecessary in his mind, he clearly admits that he ran from the police

who told him that he was being arrested on a parole/probation warrant and that he did not

voluntarily submit to the police."). This argument lacks merit.

According to the amended complaint, Chapolini is awaiting the disposition of his charge

for resisting arrest. Am. Compl. at 5. The court notes that according to the publicly available

dockets for the Courts of Common Pleas, it appears that Chapolini pleaded guilty to Resisting

Arrest on January 30, 2019, and the trial court sentenced him to one year of probation. *See*

Docket, *Commonwealth v. Chapolini*, CP-23-CR-1869-2018 (Del. Ct. Com. Pl.), *available at*

https://ujsportal.pacourts.us/DocketSheets/CPReport.ashx?docketNumber=CP-23-CR-0001869-

2018&dnh=pd2Y0SzWDcTtXdZVqFo0vg%3d%3d (last accessed August 23, 2019).[12] Even if

---

force used in making the arrest determines whether the police officer's conduct constitutes an
assault and battery.

*Renk*, 641 A.2d at 293.

"A police officer may be held liable for assault and battery when a jury determines that the force used in
making an arrest is unnecessary or excessive[.]" *Id.* To establish that officers acted with willful misconduct, a
plaintiff would have to show "not only that the [Officers] intended to commit the acts that [they are] accused of
carrying out, but also that [the Officers] understood that the actions [they] intended to take were illegal and chose to
take the actions anyway." *Boardman v. City of Philadelphia*, 661 F. App'x 183, 188 (3d Cir. 2016) (alterations in
original) (citation and internal quotation marks omitted). Here, it is arguable that Chapolini has alleged willful
misconduct on the part of the officers, but it does not appear that he is asserting any state law claim.

[12] According to the City of Philadelphia Prison System's inmate locator, it does not appear that Chapolini is
currently incarcerated there and appears that any detainers relating to parole or probation violation issues have been
resolved. *See* Docket, *Commonwealth v. Chapolini*, No. CP-51-CR-903068-2006 (Phila. Ct. Com. Pl.), *available at*
https://ujsportal.pacourts.us/DocketSheets/CPReport.ashx?docketNumber=CP-51-CR-0903068-
2006&dnh=KKZzo4ly%2fGdl%2bB5t%2bjQc2w%3d%3d (last visited August 27, 2019); Docket, *Commonwealth
v. Chapolini*, No. CP-51-CR-610221-2006 (Phila. Ct. Com. Pl.), *available at*
https://ujsportal.pacourts.us/DocketSheets/CPReport.ashx?docketNumber=CP-51-CR-0610221-
2006&dnh=RtkWHvR7pME0XnpuNbk0pg%3d%3d (last visited August 27, 2019). Chapolini has not updated his

he has a conviction for resisting arrest, it would not necessarily preclude him from asserting an excessive force claim. *See Nelson v. Jashurek*, 109 F.3d 142, 145 (3d Cir. 1997) (concluding that "a finding that [the plaintiff] used excessive 'substantial force' would not imply that the arrest was unlawful and thus the Supreme Court's example of how *Heck v. Humphrey*, 512 U.S. 477 (1994) can bar a civil action is not applicable here.").[13] Thus, the court cannot conclude that Chapolini is precluded from asserting an excessive force claim at this time, despite the distinct possibility that his conduct in fleeing and not placing his hands behind his back when ordered to do so, will seemingly make it difficult to establish liability in this case.[14] *See id.* at 146 ("[W]hile we do not doubt that even on the facts as presented by [the plaintiff] it will be difficult for him to establish liability in this case, we do not see why a judgment in his favor would throw the validity of his conviction into doubt."). Accordingly, court denies this part of the motion.

---

address with the clerk of court despite it appearing that he is no longer incarcerated, which would appear to violate our Local Civil Rules. *See* E.D. Pa. Loc. Civ. R. 5.1(b) ("Any party who appears pro se shall file with the party's appearance or with the party's initial pleading, an address where notices and papers can be served. Said party shall notify the Clerk within fourteen (14) days of any change of address.").

[13] *Heck* bars section 1983 actions which implicate the validity of an underlying criminal conviction unless said conviction has been invalidated. 512 U.S. at 487. When a plaintiff brings a section 1983 action that involves an underlying criminal conviction, *Heck* requires courts to determine

> whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

*Id.* (footnotes omitted). In practice, *Heck* requires a section 1983 plaintiff to have received a "favorable termination" before bringing claims which implicate their underlying criminal conviction (*e.g.*, false arrest, malicious prosecution). *Bronowicz v. Allegheny Cty.*, 804 F.3d 338, 344–46 (3d Cir. 2015).

[14] Even if there was a conviction, it is unclear that the court could determine whether *Heck* would bar an excessive force claim based solely on reviewing the allegations in the amended complaint, *i.e.* without information about what transpired in the state court criminal proceedings. The court also notes that with a finding of guilt to resisting arrest, Chapolini could not use this action to challenge the underlying state court determination and he could not claim that there are disputed facts for summary judgment purposes. *See Nelson*, 109 F.3d at 146 (explaining that without an "impairment" of the underlying conviction, "if this case reaches trial, the trier of fact must be aware that Jashurek was justified in using "substantial force" in arresting Nelson. Otherwise there would be a danger that in returning a general verdict against Jashurek predicated on a finding that he used excessive force, the trier of fact might base its verdict on findings not consistent with the conclusion the jury reached in the criminal case, *i.e.*, that Jashurek was justified in using "substantial force" to arrest Nelson").

Although the court is denying the part of the defendants' motion dealing with the excessive force claim against Officers Capodanno and Flores, the court must dismiss the claim against Officer Flores under 28 U.S.C. § 1915(e)(2)(B)(ii). Chapolini did not name Officer Flores as a defendant in the original complaint but added him in the amended complaint. *Compare* Compl. at 1 *with* Am. Compl. at 1. While Chapolini alleges that Officer Flores was an officer with the UDPD on March 1, 2018, Am. Compl. at ¶ 6, there are no factual allegations about Officer Flores using excessive force. Instead, Chapolini alleges that Officer Capodanno, Officer Donohue, and Captain Johnson are the individuals who arrested him as he approached the bottom of the vestibule steps. *Id.* at ¶ 18. His conclusory sentence in count four that Officer Flores (and Officer Donohue) "exercised deliberate indifference by using more force than necessary, causing the plaintiff his injuries," is insufficient to state a plausible claim for excessive force against Officer Flores because he does not allege any facts that Officer Flores used force toward him. Therefore, the court will dismiss the excessive force claim against Officer Flores for the failure to state a claim under 28 U.S.C. § 1915(e)(2)(B)(ii).

5. **Failure to Supervise Claims Against Captain Johnson and Officer Gamber for Excessive Force Used to Arrest Chapolini and for the Strip Search**

Concerning Chapolini's claims for failure to supervise against Captain Johnson and Officer Gamber pertaining to the strip search, the defendants unfortunately do not discuss that Chapolini has asserted this claim against Officer Gamber. Defs.' Mem. at 6–7. Their only argument for dismissal relates to Captain Johnson, and they argue as follows: "There is also no cause of action that is viable based upon the strip/cavity search as a matter of law nor is there even an allegation that the Captain participated in it or directed it." Defs.' Mem. at 7.

The defendants correctly point out that Chapolini does not specifically allege that Captain Johnson participated in physically strip-searching him or that he directed others to do so. Yet,

they ignore the allegation that both Captain Johnson and Officer Gamber were physically present during the strip search. *See* Am. Compl. at ¶ 19 ("Defendant Capodanno then placed the plaintiff in cell#2 *with the other defendants watching, along with other (U.D.P.D.) employee's [sic] looking through the cell window*, where defendant Capodanno began to strip search plaintiff down to his boxers . . . ." (emphasis added)). This allegation of physical presence during the search would surely satisfy these defendants' knowledge and acquiescence of a constitutional violation if Chapolini could prove a violation occurred. *See, e.g.*, *Santiago*, 629 F.3d at 130 (explaining that plaintiff is required to plead facts to show it was plausible that supervisor defendant "had knowledge of Alpha Team's use of excessive force *during the raid* and acquiesced in and acquiesced in Alpha Team's violations." (alterations, internal quotation marks, and citation omitted)). As the court has also already determined that the defendants have not satisfied their burden to show that Chapolini has failed to state a claim pertaining to the strip search, the court must also deny their motion to the extent that they seek dismissal of supervisory liability, personal liability claims against Captain Johnson and Officer Gamber relating to the strip search.

As for the excessive force claim, there are no allegations that Officer Gamber participated in Chapolini's arrest, directed others to arrest Chapolini, or that he had knowledge of or acquiesced in the violation. Officer Gamber's preparation of an incident report after the fact would not be sufficient to state a claim against him in his individual capacity. Unlike the claims against Officer Gamber, Chapolini alleges that Captain Johnson personally participated in his arrest and the use of excessive force. Thus, he has alleged a supervisory/individual liability claim against Captain Johnson. Accordingly, the court will dismiss the supervisory claim against Officer Gamber to the extent Chapolini asserts a failure to supervise claim against him relating to

the use of excessive force, but the court will deny the motion to dismiss to the extent the defendants seek dismissal of supervisory liability claims against Officer Gamber and Captain Johnson relating to the strip search, and to the extent they seek dismissal of the supervisory liability claim against Captain Johnson for the use of excessive force.

### 6. Equal Protection Claim Against Officer McDonald

Chapolini complains that Officer McDonald violated his equal protection rights when he did not take his report of a crime because of his appearance and then, after learning about the active probation and parole warrants, turned him into a target. Regarding this claim, the Fourteenth Amendment prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. A plaintiff must identify a similarly situated individual whom the state treated differently to establish an equal protection claim and the failure to do so warrants dismissal of the claim. *See, e.g., Karns v. Shanahan*, 879 F.3d 504, 521 (3d Cir. 2018) (holding equal protection claim lacked merit, in part, because plaintiffs "point[ed] to no evidence that [the officers] treated similarly situated individuals differently. They d[id] not even identify other individuals who might be similarly situated" (footnote omitted)); *Mann v. Brenner*, 375 F. App'x 232, 238 (3d Cir. 2010) (affirming dismissal of equal protection claim because plaintiff failed to plausibly plead that he was treated differently than other similarly situated people); *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006) ("[Plaintiff's] claim must fail because he does not allege the existence of similarly situated individuals—i.e., Borough Managers—who[m the former mayor of Kutztown] treated differently than he treated [plaintiff]." (citation omitted)). "[G]eneral accusations and the invocation of the Equal Protection Clause are not enough." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

Here, the defendants assert that Chapolini has failed to state a claim because he does not allege the aspect of his appearance that he believes led to unequal treatment, and "it could not legally be based on the fact that McDonald checked for active warrants on [Chapolini] when he came into . . . report whatever incident he was there to discuss as this would appear to be standard and typical for police personnel to do." Defs. Mem. at 8. Chapolini responds by arguing:

> The fact that the plaintiff is a black male is why defendant McDonald denied him service and ran the plaintiffs [sic] name for a check for warrants. There is no doubt in the plaintiff [sic] mind that if he were of a lighter color, this incident wouldn't have happened. Also the plaintiff after being in custody still wasn't allowed to file his report. An[d] the plaintiff being of [A]frican and [S]icilian[-A]merican descent [sic], an equal protection rights claim against the defendant is proper.

Pl.'s Resp. at 2.

The defendants are correct that Chapolini has failed to state a claim for relief insofar as he has not alleged that he was treated differently from similarly situated individuals in the amended complaint. He has done so in his reply to the motion to dismiss, but these allegations are not included in the amended complaint. He does not mention his race or his belief that he was treated differently than individuals with a lighter skin color. As such, he has failed to state a claim for an equal protection violation. *See, e.g.*, *Johnson v. Crim. Justice Ctr.*, Civ. A. No. 19-1490, 2019 WL 1754753, at *3 (E.D. Pa. Apr. 18, 2019) ("Because there is no allegation that Johnson was treated any differently from another person in a similar situation or that he was discriminated against on an impermissible basis, the Equal Protection claim is dismissed.").

Two additional points must be mentioned: First, the court cannot conceive how Chapolini can maintain an Equal Protection Clause claim regarding what happened after Officer McDonald discovered that there were active warrants for his arrest. Chapolini appears to not understand that

those active warrants permitted the police to take him into custody while in their presence. There was no obligation for them to take his criminal report after discovering his active warrants and, more importantly, for an equal protection claim, he would have to allege (and ultimately prove at trial) that Officer McDonald would have taken a report of a crime from another person who was arrested pursuant to outstanding warrants and whom had just been charged with resisting arrest after trying to leave the police station.

Second, the court disagrees with the defendants' assertion that Officer McDonald could not have committed an Equal Protection Clause violation because he ran a warrant check that "would appear to be standard and typical for police personnel to do." Defs.' Mem. at 8. Chapolini could plausibly assert an equal protection claim if he alleges that due to his race, Officer McDonald, instead of taking his report of criminal activity, decided to check to see if he had outstanding warrants because Officer McDonald would not have done so if Chapolini had a lighter skin color. Chapolini has not pleaded such a claim yet, but there is nothing in the record to show that Officer McDonald ran the warrant check because it was part of a standard procedure when individuals report criminal activity.[15] While such a policy would seemingly negate any potential equal protection claim, these facts are not in the record and do not warrant the court's denial of a motion to dismiss. Regardless, because Chapolini has not included allegations in the amended complaint like those he included in his response to the motion to dismiss, the court dismisses his equal protection claim.

### 7. Qualified Immunity

The defendants have moved to dismiss the complaint based on qualified immunity. Defs.' Mem. at 10. Their only argument is that they are entitled to qualified immunity because

---

[15] There obviously also could have been other aspects of Officer McDonald's interaction with Chapolini that led him to check to see if he had any outstanding warrants, and these other considerations also may not have violated the Equal Protection Clause.

Chapolini "has failed to plead any cognizable civil rights or state law claims that could overcome the defense of qualified immunity to which each of the employees would be entitled." *Id.*

The defendants have qualified immunity for the claims against them in their individual capacities if their conduct "does not violate a clearly established statutory or constitutional right of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "The doctrine is designed to 'give[] government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Bryan v. United States*, 913 F.3d 356, 362 (3d Cir. 2019) (quoting *City and Cty. of San Francisco, Cal. v. Sheehan*, 135 S.Ct. 1765, 1774 (2015)); *see also Pearson*, 555 U.S. at 231 ("The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." (citation and internal quotation marks omitted)). As an affirmative defense, "the burden of establishing qualified immunity falls to the official claiming it as a defense." *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 176 (3d Cir. 2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)).

> Assessing a qualified immunity defense requires a two-step analysis:
>
> First, a court must "determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Wilson*, 212 F.3d at 786 (citation omitted). Second, if plaintiff has alleged such a deprivation, a court should "proceed to determine whether that right was clearly established at the time of the alleged violation." *Id.* This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). A constitutional right is established if it is sufficiently clear and well-defined so that "a reasonable official would understand that what he is doing violates that right." *Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004) (citations omitted). Even if a reasonable official would so understand, the defendant may still be shielded from liability if he made a reasonable mistake as to what the law requires. *Id.* Although it is important to resolve qualified immunity questions at the earliest possible stages of litigation,

the importance of resolving qualified immunity questions early "is in tension with the reality that factual disputes often need to be resolved before determining whether defendant's conduct violated a clearly established constitutional right." *Curley*[, 298 F.3d at 277–78]. A decision as to qualified immunity is "premature when there are unresolved disputes of historical facts relevant to the immunity analysis." *Id*. at 278.

*Brockington v. City of Phila.*, 354 F. Supp. 2d 563, 567–68 (E.D. Pa. 2005).

As indicated above, the defendants have only focused on the first part of the qualified immunity analysis in contending that it applies at this early stage. The court has already determined that the defendants failed to show that Chapolini failed to state a claim pertaining to the strip search or the use of excessive force in arresting him, except insofar as Chapolini has asserted a failure to supervise claim against Officer Gamber. While the court has determined that Chapolini failed to state a claim relating to the failure to provide *Miranda* warnings, the court recognizes that Chapolini alleges that his criminal proceedings are ongoing (even though it appears that they have concluded). As time has elapsed between the filing of the amended complaint and the court's disposition of this motion, it is possible that Chapolini will have information to add to another amended complaint about the disposition of his criminal proceedings. Moreover, as to his equal protection claim against Officer McDonald, Chapolini has included allegations in his reply brief that could possibly state a plausible claim. Accordingly, as the court will be providing Chapolini with leave to file an amended complaint, the court defers addressing whether Officer Capodanno and Officer Gamber are entitled to qualified immunity on the *Miranda*-based claim, and whether Officer McDonald is entitled to qualified immunity on the equal protection claim, until Chapolini files a second amended complaint. *See Carvalho v. Bledsoe*, Civ. No. 3:CV-11-1995, 2012 WL 4472023, at *36–38 (M.D. Pa. Sept. 26, 2012) (deferring disposition of defendant's qualified immunity claim

because court was allowing plaintiff to file amended complaint to address certain factual issues).[16]

### 8. Chapolini's Request for Declaratory Relief

The defendants also request that the court strike Chapolini's request for declaratory relief. Defs.' Mem. at 11. They point out that "[d]eclaratory relief is not proper solely to adjudicate past conduct, or to simply proclaim that one party is liable to another." *Id.* (citations omitted). Chapolini does not address this argument in his response to the motion. Nonetheless, the court agrees that request for declaratory relief is improper and should be stricken.

A "[d]eclaratory judgment is inappropriate solely to adjudicate past conduct . . . [n]or is [a] declaratory judgment meant simply to proclaim that one party is liable to another." *Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (per curiam). Here, Chapolini does not explain why he is seeking declaratory relief and it appears that he is only seeking relief for what happened to him on March 1, 2018 at the UDPD. It therefore appears that he is attempting to only adjudicate past conduct and the court will strike the request for declaratory relief.

### C. Leave to Amend

A district court should generally provide a *pro se* plaintiff with leave to amend unless amending would be inequitable or futile. *See Grayson v. Mayview St. Hosp.*, 293 F.3d 103, 114 (3d Cir. 2002) (stating general rule). Also, "in civil rights cases district courts must offer amendment—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007). In this case, the court finds that amending

---

[16] The defendants appear to assert that they are entitled to qualified immunity (discussing only federal law related to qualified immunity under section 1983) for Chapolini's state law claims. Defs.' Mem. at 10. The court has already determined that it does not appear that Chapolini is asserting any state law claims. Nevertheless, the federal law of qualified immunity would not apply to any state law claims. To the extent that the Political Subdivision Tort Claims Act would apply, the court has already addressed the defendants' arguments relating to this Act.

the complaint would not be futile, so the court will grant Chapolini leave to file a second amended complaint.[17]

### III.    CONCLUSION

For the reasons stated above, the court dismisses any official capacity claims and an individual liability claim against Officer Flores for excessive force under 28 U.S.C. § 1915(e)(2)(B).[18] The court denies the motion to dismiss insofar as it (1) seeks to dismiss any claims relating to the strip search, (2) dismiss excessive force claim against Officer Donahue and Captain Johnson, and (3) dismiss the amended complaint because of qualified immunity. The court will also grant the motion to the extent it seeks to (1) dismiss excessive force claim against Officer Gamber, (2) dismiss claims relating to the failure to provide him with *Miranda* warnings, (3) dismiss cause of action against Officer McDonald for an Equal Protection Clause violation, and (4) strike the claim for declaratory relief.

---

[17] If Chapolini does not file a second amended complaint, this matter will proceed on only those causes of action that the court has not dismissed in this opinion and the separately filed order.

[18] Chapolini previously sought appointment of counsel, although he later indicated he was seeking to employ private counsel. *See* Doc. Nos. 13, 17. The court notes that civil litigants do not have a constitutional right to counsel. *See Parham v. Johnson*, 126 F.3d 454, 456 (3d Cir. 1997) ("The Supreme Court has not recognized nor has the court of appeals found a constitutional right to counsel for civil litigants." (citation omitted)). Nonetheless, pursuant to 28 U.S.C. § 1915(e)(1), "[a] court may request an attorney to represent any person unable to employ counsel." *Id.* at 457 (quoting *Tabron v. Grace*, 6 F.3d 147, 153 (3d Cir. 1993)). However, the Third Circuit has directed district courts to "exercise care in appointing counsel because volunteer lawyer time is a precious commodity and should not be wasted on frivolous cases." *Id.* (citation omitted). Therefore, a court should appoint counsel only when cases "have some merit in fact and law." *Id.* (citation omitted).

    If the plaintiff's claim has merit, then the Third Circuit has suggested that the following factors serve as a guidepost to courts in determining whether to employ counsel:

    (1) the plaintiff's ability to present his or her own case;
    (2) the complexity of the legal issues;
    (3) the degree to which factual investigation will be necessary and the ability of the plaintiff to pursue such investigation;
    (4) the amount a case is likely to turn on credibility determinations;
    (5) whether the case will require the testimony of expert witnesses;
    (6) whether the plaintiff can attain and afford counsel on his own behalf.

*Id.* (citation omitted).

    Here, the court will deny Chapolini's request at this time because it appears that he is no longer incarcerated (insofar as the court has a civil rights attorney panel only for individuals who are incarcerated) and he has not renewed his request for the appointment of counsel since he indicated that he was seeking private counsel. Chapolini may renew his request should he again seek the appointment of counsel.

The court will enter a separate order.

BY THE COURT:


*/s/ Edward G. Smith*
EDWARD G. SMITH, J.