IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VINCENT AIENNE CHAPOLINI,      :
                                       :
                   Plaintiff,    :        CIVIL ACTION NO. 18-2629
                                         :
     v.                               :
                                       :
ANTHONY CAPODANNO #0119,      :
KEVIN DONOHUE #0026, JAMES      :
FLORES #0125, WALTER MCDONALD  :
(Station Security), and THOMAS      :
JOHNSON (Captain) #0815, individually  :
and in their official capacities,       :
                                       :
              Defendants.    :

**<u>MEMORANDUM OPINION</u>**

Smith, J.                                          September 20, 2021

The plaintiff brings claims under the Fourth and Fourteenth Amendments against various municipal police officers for injuries stemming from his arrest and subsequent detention. The plaintiff argues that (1) the officers use excessive force when they allegedly slammed him to the ground in an attempt to arrest him, (2) one of the officers forcibly strip-searched him and performed an unauthorized body cavity search on him while he was detained, and (3) multiple officers failed to intervene to stop his constitutional rights from being violated. The officers have now moved for summary judgment, arguing that the plaintiff has failed to state a claim for his injuries and that they are entitled to qualified immunity. For the following reasons, the court grants the defendants' motion for summary judgment.

## I.     ALLEGATIONS AND PROCEDURAL HISTORY

On June 18, 2018, the plaintiff, Vincent Aienne Chapolini ("Chapolini"), proceeding *pro se*, filed a complaint against Officers Anthony Capodanno, Thomas Johnson, Kevin Donohue, and

the Upper Darby Police Department, an application for leave to proceed *in forma pauperis*, and a copy of his prisoner trust fund account statement.[1] Doc. Nos. 1–3. The court entered an order granting Chapolini leave to proceed *in forma pauperis* on June 26, 2018. Doc. No. 5.

In late July 2018, after the defendants had waived service, *see* Doc. Nos. 9–12, Chapolini filed a request for appointment of counsel and a motion for a default judgment. Doc. Nos. 13, 14. This court entered an order denying the request for a default judgment on July 31, 2018, as none of the defendants were in default. Doc. No. 15.

The defendants filed a motion to dismiss the complaint on August 15, 2018. Doc. No. 18. After receiving two extensions of time, Chapolini responded to the motion to dismiss by filing a motion for leave to file an amended complaint on September 10, 2018. Doc. Nos. 18–23. The court granted the motion for leave to file an amended complaint on September 17, 2018. Doc. No. 24.

Chapolini filed an amended complaint on October 2, 2018, naming as defendants Officers Capodanno, Donohue, and Johnson, as well as Officer James Flores, Walter McDonald ("McDonald"), and Glenn Gamber, in their official and individual capacities.[2] Doc. No. 25. Chapolini asserted multiple causes of action in the amended complaint.[3] Am. Compl. at 6–7. His

---

[1] The federal "prisoner mailbox rule" provides that a pro se prisoner's petition is deemed filed "at the time petitioner delivered it to the prison authorities for forwarding to the court clerk." *Houston v. Lack*, 487 U.S. 266, 276 (1988). Although the doctrine arose in the context of habeas corpus petitions, the Third Circuit has extended it to civil actions brought under 42 U.S.C. § 1983. *See Pearson v. Secretary Dep't of Corr.*, 775 F.3d 598, 600 n.2 (3d Cir. 2015) (applying rule in section 1983 action and determining that *pro se* prisoner plaintiff filed complaint on date he signed it). Unfortunately, Chapolini does not include a declaration about when he provided the complaint to prison officials for mailing to the clerk of court. He does, however, date the complaint on June 18, 2021, *see* Doc. No. 2 at ECF p. 11, and the court uses this date as the filing date.

[2] Chapolini did not include a claim against the Upper Darby Police Department in the amended complaint. *See* Doc. No. 25.

[3] In the amended complaint, Chapolini alleged that the Upper Darby Police Department employed the defendants as officers. Am. Compl. at ¶¶ 4–9, Doc. No. 25. On March 1, 2018, Chapolini alleged that he entered the UDPD to "file a report a[bout] a fraud crime that was committed against [him], with [his] information and without [his] permission." *Id.* at ¶ 13. Chapolini then encountered McDonald, who was acting as station security. *Id.* at ¶¶ 7, 13.

McDonald was "very rude" to Chapolini and pretended to take his fraud report while he was checking Chapolini's personal information for any active warrants. *Id.* at ¶ 14. Chapolini waited for 15 minutes for a receipt of his fraud report, but McDonald had determined that there were two active warrants for him pertaining to parole and probation violations. *Id.* at ¶ 15. At this point, McDonald "ignored/neglected [Chapolini's] right to receive assistance from the [UDPD] and made [Chapolini] the target." *Id.*

first cause of action was a substantive due process violation against Officer Capodanno for his

deliberate indifference to Chapolini's health and safety when he strip-searched him in a public

setting and on an open circuit camera which allowed unauthorized and individuals from the

opposite sex to observe it. *Id.* at 6. The second cause of action was for "deficient management of

subordinates," against Officer Gamber because he

> exercised deliberate indifference when he knowingly approved incident and
> incident of arrest reports, which documented [Chapolini's] constitutional right's
> [sic] were being violated, with being taken into custody without the plaintiff being
> issued a [*Miranda*] warning, in which [Officer] Gamber should've re-directed his
> subordinate [Officer] Capodanno to do so.

*Id.* Chapolini also asserts the same cause of action against Captain Johnson and Officer Gamber

because they "fail[ed] to properly supervise [his] apprehension for his active warrant, which [their]

negligence of their subordinates[] caused [his] injuries[, and they] poor[ly] supervis[ed] . . . [his]

unwarranted strip search." *Id.* Chapolini's third cause of action was an Equal Protection Clause

---

While Chapolini was waiting, he began to talk on his cellphone and decided to "get some air." *Id.* at ¶ 16. He headed through the lobby door into the vestibule, when Officer Capodanno confronted him and told him that he was under arrest but did not tell him why he was under arrest. *Id.* Chapolini claims that he was unaware of the active warrants for his arrest and out of a fear for his wellbeing, ran (or tried to run), into the view of his employer, who had driven him to the police station so he could file the report, "in case anything wrong was to happen." *Id.* at ¶ 17.

After Chapolini reached the bottom of the vestibule steps, Officer Capodanno, Officer Donahue, and Captain Johnson "grabbed" him. *Id.* at ¶ 18. One of the officers grabbed Chapolini's left arm, another grabbed his right arm, and the last one grabbed his head. *Id.* One of these defendants "excessively slammed" Chapolini's head into the vestibule floor. *Id.* Chapolini suffered a "minor" injury to his head, left wrist, and left hand, and a "major" injury to his left rear shoulder. *Id.*

Officer Capodanno then moved Chapolini into a cell. *Id.* at ¶ 19. With the other defendants and UDPD employees watching through the cell window, Officer Capodanno began to strip search Chapolini down to his boxers. *Id.* Officer Capodanno "aggressively grabb[ed] [Chapolini's] testicles and between his anus [sic]." *Id.* The entire search occurred on an open circuit station security camera. *Id.*

Later, Chapolini repeatedly complained about the severe pain from his injuries, and medics came to examine him. *Id.* at ¶ 20. The medics determined that Chapolini needed immediate medical attention and he was transported to the Delaware Memorial Hospital for treatment. *Id.* After being treated there, he was released back to UDPD custody. *Id.* Once he was returned to the UDPD, Officer Capodanno informed him that the police were charging him with resisting arrest. *Id.* at ¶ 21. Chapolini requested an attorney, but Officer Capodanno said that Chapolini "had no rights." *Id.* Officer Capodanno also stated that he did not have to read *Miranda* warnings to Chapolini, and he proceeded to question him. *Id.*

Chapolini alleged that he was awaiting trial for a "retaliatory accusation of resisting arrest, with no reg[]ard to his [F]ifth [A]mendment constitutional rights." *Id.* at ¶ 22. Also, Officer Gamber "approved/cleared all video, report's [sic], note's [sic], concerning this matter." *Id.*

claim against McDonald because he "ignor[ed his] request to report a crime based on [his] appearance, prior and after . . . learning of [his] active parole/probation violation warrants." *Id.* at 6–7. McDonald also "made [Chapolini] a target, victimizing [him]." *Id.* at 7. For his final cause of action, Chapolini asserts a cause of action for "negligence/failure to protect" against Officers Donahue and Flores because they "exercised deliberate indifference by using more force th[a]n necessary, causing [Chapolini's] injuries." *Id.*

The defendants filed a motion to dismiss the amended complaint on October 4, 2018. Doc. No. 27. Chapolini filed a response in opposition to the motion to dismiss on October 18, 2018. Doc. No. 28.

The court denied the motion to dismiss the original complaint as moot on March 6, 2019. Doc. No. 32. On September 5, 2019, the court issued a memorandum opinion and order granting in part and denying in part the motion to dismiss the amended complaint. Doc. No. 34. The court dismissed without prejudice (1) any claims against the defendants in their official capacities, (2) Chapolini's claim for excessive use of force against Officer Flores, (3) Chapolini's failure to supervise claim against Officer Gamber relating to the alleged failure to provide *Miranda* warnings, (3) Chapolini's failure to supervise claim against Officer Gamber pertaining to allegations of excessive force, (4) Chapolini's Equal Protection Clause violation against McDonald, and (5) any claims for declaratory relief. *See* Sept. 5, 2019 at 1–2, Doc. No. 34. In all other respects, the court denied the motion.[4] *See id.* at 2.

---

[4] This included the court denying the defendants' request that the court dismiss any claims relating to the strip search of Chapolini, including any supervisory claims against Officer Gamber and Captain Johnson. *See* Mem. Op. at 2, Doc. No. 34. In addition, the court denied the motion to the extent the defendants sought to have the court dismiss an excessive force claim, except as asserted against Officer Flores. *Id.* at 3. The court also denied the motion without prejudice to the extent the defendants sought dismissal based on qualified immunity. *Id.*

Along with disposing of the motion to dismiss, the court denied without prejudice Chapolini's motion for the appointment of counsel. *See* Sept. 5, 2019 Order at 2.

The defendants filed an answer to the amended complaint on October 15, 2019. Doc. No. 36. Chapolini filed a new motion for the appointment of counsel on February 18, 2020. Doc. No. 39. The court granted Chapolini's motion for the appointment of counsel on February 21, 2020 and referred this matter to the Prisoner Civil Rights Panel to see if any member of the Panel would accept representation of Chapolini. Doc. No. 42. A member from the Panel graciously agreed to represent Chapolini, and the court entered an order appointing counsel for him on March 10, 2020.[5] Doc. No. 47.

On April 1, 2020, after a telephone conference with counsel, the court granted the plaintiff leave to file a second amended complaint. Doc. No. 50. On May 1, 2020, Mr. Chapolini filed a counseled second amended complaint against McDonald and Officers Capodanno, Donohue, Flores, and Johnson. Doc. No. 52.[6]

The defendants filed a motion to dismiss the second amended complaint on May 5, 2020.[7] Doc. No. 56. In response to this motion, Chapolini filed a motion for leave to file a third amended complaint along with a proposed third amended complaint on June 10, 2020. Doc. Nos. 62, 63. The court granted Chapolini's motion and deemed the third amended complaint (Doc. No. 63) to be properly filed. Doc. No. 64.

---

[5] Actually, two attorneys from the Panel agreed to represent Chapolini in this case, *see* Doc. Nos. 46, 47. The court resolved the issue and ultimately appointed David Wesley Cornish, Esquire, as Chapolini's counsel. *See* Doc. No. 47.

[6] Along with the second amended complaint, Chapolini also filed a motion for leave to file a second amended complaint. Doc. No. 51. Since the court had already given Chapolini leave to file this amended complaint, the court entered an order on May 4, 2021, denying the motion for leave to file a second amended complaint as moot. Doc. No. 54.

The court also notes that Chapolini did not name Officer Gamber as a defendant in the second amended complaint. In addition, even though Chapolini did not name UDPD as a defendant in the amended complaint, he stipulated to the dismissal of the UDPD as a defendant on May 1, 2020. Doc. No. 53.

[7] In the motion, the defendants moved to have the court dismiss (1) any official capacity claims against the defendants, (2) all claims under the Eighth and Fourteenth Amendments, (3) all claims for false arrest and malicious prosecution, and (4) all claims under the Pennsylvania Constitution. *See* Mem. of Law in Supp. of Defs.' Mot. to Dismiss Pl.'s Am. Compl. Pursuant to Fed. R. Civ. P. 12(b)(6) at 4–8, Doc. No. 56.

In the third amended complaint, Chapolini alleges that on March 1, 2018, he entered the UDPD to report a crime when McDonald told him that he had a warrant. 3d Am. Compl. at ¶ 12, Doc. No. 63. Chapolini was speaking on his phone in the vestibule area of the police station when Officer Capodanno told him that he was going to be arrested. *Id.* Chapolini then tried to go to where his employer was waiting for him, so that the employer could witness the arrest. *Id.* While trying to reach his employer, Chapolini descended a set of steps. *Id.* When Chapolini reached the bottom of the steps, Officers Capodanno, Donohue, Johnson, and Flores grabbed him by the arms and head and slammed his head into the floor. *Id.* They did this even though Chapolini was not resisting arrest, and their actions caused injuries to Chapolini's head, upper body, and shoulder. *Id.*

After the officers arrested Chapolini, Officer Capodanno took him to a jail cell where, in the full view of other arrestees and a semi-private area of the police station, had his clothes removed and then "aggressively searched his private area, including shoving his hand into [Chapolini's] anus, and repeatedly grabbing [Chapolini's] testicles very forcefully and roughly." *Id.* at ¶ 13. Once Officer Capodanno had finished his search, he left Chapolini in the cell. *Id.* at ¶ 14. Chapolini then started to complain of extreme pain to his shoulder and testicles. *Id.*

Due to Chapolini's complaints of injuries, UDPD personnel contacted paramedics who arrived at the station and transported Chapolini to the emergency room at the Delaware County Memorial Hospital. *Id.* at ¶ 15. Chapolini alleges that while at the hospital, he was treated for injuries to his shoulder, upper body, and testicles. *Id.*

Based on these allegations, the plaintiff asserted causes of action under 42 U.S.C. §§ 1983, 1985, and 1988 for (1) "excessive force/misuse of legal force & assault and battery" and (2) failure

to intervene. *See id.* at ECF pp. 3–6. For relief, Chapolini indicated that he was seeking, *inter alia*, compensatory damages, punitive damages, and attorney's fees and costs. *Id.* at ECF pp. 6–7.

On June 16, 2020, the defendants filed an answer to the third amended complaint. Doc. No. 67. On June 18, 2020, the court denied as moot the defendants' motion to dismiss the second amended complaint. Doc. No. 70. The court entered an order on July 7, 2020, establishing, *inter alia*, a schedule for the completion of discovery. Doc. No. 73.

After completing discovery, the defendants filed a motion for summary judgment on January 21, 2021. Doc. Nos. 80, 83. Chapolini received an extension of time to file his response in opposition to the motion, *see* Doc. Nos. 86, 76, and filed his response on March 9, 2021. Doc. No. 88. On March 25, 2021, the court held oral argument on the motion for summary judgment. The motion for summary judgment is ripe for disposition.

## II.    DISCUSSION

### A.    <u>Applicable Standard of Review</u>

"Summary judgment is appropriate where, construing all evidence in the light most favorable to the nonmoving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020) (quoting *Sec'y U.S. Dep't of Labor v. Kwasny*, 853 F.3d 87, 90 & n.5 (3d Cir. 2017)). In determining whether to grant summary judgment, the court may consider pleadings, depositions, answers to interrogatories, admissions, and affidavits submitted by the parties. *United States v. Weiss*, 461 F. Supp. 3d 183, 187 (E.D. Pa. 2020).

A "genuine" factual dispute exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A material fact is one that "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 248)). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248 (citing 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93–95 (1983).

The moving party bears the "initial burden of identifying specific portions of the record that establish the absence of a genuine issue of material fact." *Morgan-Lapp v. Reliance Standard Life Ins. Co.*, Civ. A. No. 18-1085, 2019 WL 653093, at *2 (E.D. Pa. Feb. 14, 2019) (quoting *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015)) (internal quotation marks omitted). The non-moving party must then identify facts that raise a genuine issue for trial by pointing to specific portions of the record. *Lichtenstein v. Lower Merion Sch. Dist.*, 316 F. Supp. 3d 855, 863 (E.D. Pa. 2018) (citing Fed. R. Civ. P. 56(c)(1)(A)). Under Rule 56, the court views the evidence in the light most favorable to the non-moving party. *Id.* at 864 (citing *Anderson*, 477 U.S. at 255). However, "[s]peculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." *Alarmforce Indus., Inc. v. Egan*, Civ. A. No. 19-4716, 2020 WL 4903774, at *2 (E.D. Pa. Aug. 20, 2020) (quoting *Boykins v. Lucent Techs., Inc.*, 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000)).

### B.      Factual Background Applicable to the Motion for Summary Judgment

This lawsuit concerns events that transpired during the course of Chapolini's arrest at the UDPD station on March 1, 2018. *See* Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. on Behalf of Defs. Anthony Capodanno, Kevin Donohue, James Flores, Thomas Johnson and Walter McDonald ("Defs.' Facts") at ¶ 1, Doc. No. 80-1.[8] Chapolini went to the UDPD station

---

[8] Because Chapolini's statement of undisputed facts merely adopts by reference portions of the defendants' statement of undisputed material facts, *see* Doc. No. 88 at ECF p. 9, only the defendants' statement of facts will be cited. Facts that are not undisputed will be so noted. Citations to deposition transcripts are disputed.

to file a police report regarding a fraudulent purchase of video games made to his account. *See* Defs. Anthony Capodanno, Kevin Donohue, James Flores, Thomas Johnson and Walter McDonald's Mot. for Summ. J. ("Defs.' Mem."), Ex. C, Dep. of Vincent Aienne Chapolini ("Chapolini Dep.") at 38:3–39:13, Doc. No. 80-2.

When he arrived at the station, Chapolini spoke to McDonald, a civilian employee, who ran Chapolini's information through the National Crime Information Center ("NCIC"), as is customary for all visitors to the police station. Defs.' Facts at ¶¶ 79–80. The NCIC indicated that Chapolini was a violent offender, an escape risk, and was wanted for violating parole. *Id.* at ¶ 81. McDonald informed Officer Capodanno that a warrant was out for Chapolini's arrest. *Id.* at ¶ 80.

Officer Capodanno, who was in full uniform, approached Chapolini and placed his right hand on his shoulder. *Id.* at ¶¶ 82, 85. He gently told Chapolini that a warrant was out for his arrest and needed to be dealt with. *Id.* at ¶ 82. While this was happening, McDonald spoke into his radio and said that a wanted person was in the lobby, prompting a number of other officers to respond. *Id.* at ¶ 83. McDonald did not leave from behind his desk. *Id.* at ¶ 84.

When Officer Capodanno approached Chapolini and told him that he was under arrest, Chapolini began to panic. *Id.* at ¶ 27. In his deposition, Chapolini stated that he then ran from the lobby in an effort to "get into the eyesight of my employer," referring to the individual who had brought him to the police station to make a police report, "just in case anything illegal or wrong happened." Chapolini Dep. at 45:19–46:19. Although he intended to leave the building, Chapolini did not intend to leave the property and merely wanted to reach the steps of the building, right outside the entrance. Defs.' Facts at ¶ 29. As Chapolini ran from the lobby toward the front steps of the police station, Officer Capodanno grabbed onto the back of Chapolini's hooded sweatshirt. *Id.* at ¶¶ 86, 88. As Officer Capodanno and Chapolini ran out of the lobby toward the front steps,

Officer Donohue and Captain Johnson, who had responded to McDonald's call for assistance, chased after Chapolini as well. *Id.* at ¶ 99.

Officer Capodanno stated in his deposition that as he held onto Chapolini's hooded sweater, Chapolini dragged him down the steps. *See* Defs.' Mem., Ex. K ("Capodanno Dep.") at 17:9–20. According to Officer Capodanno, he was unable to gain control of Chapolini until Officer Donohue and Captain Johnson arrived. *Id.* at 15:16–16:3.

Chapolini stated in his deposition that he was slammed into a door and onto the floor while being arrested. *See* Chapolini Dep. at 51:4–7; Defs.' Facts at ¶¶ 31, 36. He does not know the identity of the officer who slammed his head. Defs.' Facts at ¶ 34. Chapolini stated that Officer Flores and Captain Johnson were not the officers who slammed his head, but he indicated that they pressed and leaned on him during the arrest. *Id.* at ¶ 40. Chapolini knows that Officer Donohue was involved generally in the arrest. *Id.* at ¶ 41. Officer Vaughn, who is not named as a defendant in this action, was also present when Chapolini was on the ground and handcuffed. *Id.* at ¶ 115. Chapolini believes it was Officer Capodanno that slammed his head because he was the one who first came into contact with Chapolini and held onto the hood of his sweater. *Id.* at ¶¶ 34, 36–37. However, he does not know the extent of Officer Capodanno's involvement. *Id.* at ¶ 38. In total, three officers leaned on Chapolini during the course of his arrest. *Id.* at ¶ 32. Because the officers were on top of Chapolini, he could not get his arm from underneath him to put behind his back. *Id.* At some point, Chapolini recalls, an officer whose identity he does not know twisted his arm behind his back and pushed it up toward his head. *Id.* at ¶¶ 33, 39.

After the police handcuffed Chapolini, the officers conducted a quick pat down search. *Id.* at ¶ 103. Officer Donohue then escorted Chapolini to the police station's holding cell area, where he performed a more thorough search. *Id.* at ¶¶ 93–94, 103.

According to Officer Donohue, detainees such as Chapolini are brought into a holding cell while still handcuffed, where the officer performing the search will perform a "feel test" of the detainee's jacket, waistband, and pockets. *Id.* at ¶ 104. The detainee's handcuffs are then removed, followed by the person's outer garments. *Id.* at ¶ 105. Once all of the person's garments are removed, the officer will run a finger along the waistband of the detainee's underwear to ensure that nothing is there, and will pull the bottom of the underwear to ensure that the detainee is not hiding any weapons or contraband. *Id.* at ¶ 106. The officer will then search the detainee using a metal detector wand. *Id.* According to Officer Donohue, an officer would never search a detainee's groin area using his hands; rather, the officer would use a metal wand. *Id.* at ¶ 107.

According to the third amended complaint, Officer Capodanno—not Officer Donohue—removed Chapolini's clothing in full view of the other officers and aggressively searched his genital area, including by shoving his hand into Chapolini's anus and repeatedly grabbing his testicles in a forceful and rough manner. *Id.* at ¶ 44. Chapolini testified that this was not the first time that he had been strip-searched, and the Department of Corrections had previously strip-searched him at least five times. *Id.* at ¶ 45. Under Upper Darby Township's policy governing prisoner strip searches, such searches can only be performed if there is a reasonable suspicion to believe that that a detainee is concealing weapons or contraband. *Id.* at ¶ 20.

In his deposition, Chapolini testified that five or six officers—possibly more—were in the holding cell with him, and that Officer Capodanno was behind him helping him remove his clothing and searching him. *Id.* at ¶¶ 51, 66. Chapolini removed all of his clothing except his t-shirt and his boxers. *Id.* at ¶ 54. Chapolini testified that this caused him emotional trauma because he felt it was unnecessary, as he had merely gone to the police station to file a police report. *Id.* at ¶ 60. Chapolini testified that as Officer Capodanno began searching him, Officer Capodanno put

his hand in Chapolini's right boxer pant leg, forcibly and repeatedly grabbed his testicles, and ran his fingers through Chapolini's anus. *Id.* at ¶¶ 62–63. However, Officer Capodanno's fingers did not penetrate Chapolini's anus; the search resembled what children call a "credit card swipe." *Id.* at ¶ 74.

Chapolini later testified at his deposition that he was unsure whether or not it was Officer Capodanno that performed the search on him. *See id.* at ¶¶ 57–59, 68, 69. Additionally, Chapolini admitted that he was mistaken when he said he was handcuffed because he had to take his clothing off himself. *Id.* at ¶ 52. Indeed, both parties now appear to agree that Officer Capodanno was not the officer that performed the strip-search. *See* Defs.' Facts at ¶¶ 95, 96, 111;[9] Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts and Additional Undisputed Facts ("Pl.'s Facts") at ¶ 2.[10] Rather, it was Officer Donahue that searched the plaintiff. Defs.' Facts at ¶ 116; *see also* Pl.'s Facts at ¶ 2.

After the search, Officer Vaughn, who was present when Officer Donohue searched Chapolini, Defs.' Facts at ¶ 116, decided to send Chapolini to the hospital for treatment. *See* Defs.' Mem., Ex. M ("Vaughn Dep.") at 18:1–8. Officer Vaughn stated in his deposition that this is standard practice for detainees who complain of pain. Vaughn Dep. at 18:13–15. Chapolini claims that he told Dr. Dumin, the physician who treated him at the hospital, and the paramedics who picked him up in the ambulance, that he was experiencing pain in his groin area. Defs.' Facts at ¶¶ 71–73. However, Officer Donohue claims that Chapolini never complained of groin pain and that he did not hear Chapolini make any such complaints when he was at the hospital. Defs.' Facts at ¶ 114; *see also* Defs.' Mem., Ex. L ("Donohue Dep.") at 19:4–12 (stating that although Chapolini complained of left shoulder pain, he did not complain of any other type of pain). Officer Vaughn

---

[9] These facts were not adopted by Chapolini and therefore are disputed.
[10] These facts were not adopted by the defendants and therefore are disputed.

also stated in his deposition that Chapolini only complained of shoulder pain. *See* Vaughn Dep. at 18:1–4. Moreover, it is impossible that Chapolini informed Dr. Dumin of any groin pain because any genital examination would have required the presence of a chaperone. Defs.' Facts at ¶ 135.

## C.    Analysis

### 1.    Excessive Force Claims

In the third amended complaint, Chapolini asserts one cause of action for excessive force against all defendants. Within that count, Chapolini separately alleges that the defendants applied excessive force against him while attempting to arrest him, and that Officer Capodanno used excessive force in conducting both a strip search and a body cavity search of him. The defendants move to have the court enter summary judgment as to these excessive force claims, arguing that Chapolini has failed to submit sufficient proof to support these claims and that they are, in any case, entitled to qualified immunity. The court will address the defendants' arguments regarding each of Chapolini's excessive force claims in turn.

#### a.    Excessive Force Claim – Arrest

i.    *There is an issue of fact as to the identity of the officer who allegedly applied excessive force against Chapolini.*

As indicated above, Chapolini asserts an excessive force claim against all defendants, alleging that they applied unconstitutional force against him while arresting him. *See* 3d Am. Compl. at ¶ 28. However, in his deposition, Chapolini clarified that he was only alleging that Officer Capodanno used excessive force against him. *See* Chapolini Dep. at 130:4–9. He explained that he was identifying Officer Capodanno as the one who applied excessive force against him because he was the first one to touch him. *See* Defs.' Facts at ¶¶ 37–38. Yet, Chapolini admits that he does not know the extent of Officer Capodanno's involvement in his arrest. Defs.' Facts at ¶¶ 37–38.

In moving for summary judgment on this excessive force claim, the defendants first argue that it is insufficient for Chapolini to merely identify a group of officers who were present during the incident in question without identifying the particular officer who applied the allegedly unconstitutional force. *See* Defs.' Mem. at 4. In response, Chapolini contends that summary judgment is not warranted because he has provided evidence identifying the defendant officer who bears primary responsibility for taking him into custody. *See* Pl. Vincent Chapolini's Mem. of Law in Supp. of Resp. to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") at ECF p. 6, Doc. No. 88. The court finds that Chapolini has adduced sufficient evidence to create a genuine issue of fact as to which officer allegedly applied unconstitutional force against him.

In general, the plaintiff in a section 1983 action must, when confronted with a motion for summary judgment, "produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 291 (3d Cir. 2018); *see also Sharrar v. Felsing*, 128 F.3d 810, 821 (3d Cir. 1999) (finding no evidentiary basis to hold defendant officers liable where plaintiff could recognize all defendants but could not identify which ones were with him when alleged abuse occurred), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007); *Seward v. City of Phila.*, Civ. A. No. 00-3563, 2002 WL 563580, at *2 (E.D. Pa. Apr. 11, 2002) (explaining that "[s]ummary judgment is warranted where the plaintiff is unable to identify the accused officers" and citing numerous decisions applying this legal principle). However, courts have declined to grant summary judgment where, despite the plaintiff's inability to identify the particular officer who applied allegedly unconstitutional force, "the evidence identifies the officer who 'bore primary responsibility for taking [the plaintiff] into custody' and could have used excessive force in doing so." *Dixon v. Schweizer*, Civ. A. No. 18-5403, 2020 WL 4600187, at *5

14

(E.D. Pa. Aug. 11, 2020) (quoting *Dull v. W. Manchester Twp. Police Dep't*, 604 F. Supp. 2d 739, 750 (M.D. Pa. 2009)).

In *Dixon*, the defendant police officers moved for summary judgment on the plaintiff's excessive force and assault and battery claims, arguing that the plaintiff had failed to identify which of two officers allegedly tackled him. *Id.* at *4. The defendants asserted that the plaintiff had only produced evidence that "a tall officer, among approximately 12 officers present, tackled him." *Id.* They also insisted that while the plaintiff had testified to encountering one of the officers previously, he could not identify that officer as the one who had tackled him. *Id.* Relying on *Dull* and drawing all inferences in favor of the plaintiff, the court denied summary judgment as to the officer the plaintiff testified to having encountered previously. *Id.* at *5. In doing so, the court noted that the officer testified in his deposition that he participated in the "takedown" of the plaintiff and that he himself had handcuffed the plaintiff. *Id.*

Similarly, here, and drawing all inferences in favor of Chapolini, as the non-moving party, there is a genuine dispute as to whether Officer Capodanno was the one who applied excessive force against him. As an initial matter, it bears noting that the cases cited by the defendants, *Howell v. Cataldi*, 464 F.2d 272 (3d Cir. 1972) and *McNeil v. City of Easton*, 694 F. Supp. 2d 375 (E.D. Pa. 2010), are distinguishable because in neither case did the plaintiff identify a specific officer as the one who allegedly applied unconstitutional force against him. *See Howell*, 464 F.2d at 283 ("There is no proof that Cataldi wielded the club or that Kinsella did; all that was said was that one of the two did."); *McNeil*, 694 F. Supp. 2d at 395 (explaining that only evidence in support of excessive force claim was plaintiff's testimony that "one officer looked at the other officer, and then he ran up the steps. Before he put the handcuffs on me, he kicked me in the back of my head"). Here, by contrast, Chapolini identified Officer Capodanno as the one who used excessive force

against him. *See* Chapolini Dep. at 130:4-9 ("Q: What officer are you accusing of excessive force? A. Mr. Capodanno. Q: He's the only one, is that correct? A: That's the only one that I am aware of."); *id.* at 130:18-20 ("Q: He was the one that arrested you, you've identified him as the person that slammed your head on the floor? A: Correct.").

It is true that Chapolini could not conclusively identify Officer Capodanno as the one who slammed his head to the floor, given that he was apprehended from behind. *See id.* at 126:9-13 (stating that Chapolini did not see Officer Capodanno apprehend him because he does not "have eyes in the back of [his] head"). However, Chapolini clearly identified Officer Capodanno as the officer who bore "primary responsibility," *Dixon*, 2020 WL 4600187, at *5, for apprehending him. For example, Mr. Chapolini testified that one officer landed on him, and that he knew it was Officer Capodanno because he was behind him. *See id.* at 127:9-13; 129:8. Chapolini also asserts that someone whom he believes to be Officer Capodanno twisted his arm and pushed it back towards his head while it was behind his back. *Id.* at 107:19-108:4. According to Chapolini, neither Officer Flores nor Officer Johnson slammed his head or injured his upper body, but they did help arrest him only after Officer Capodanno had pinned him down. *Id.* at 140:12-141:5. Chapolini also testified that he believes Officer Donahue became involved only after he had been slammed to the ground. *See id.* at 141:14-22. Moreover, McDonald could not have applied the excessive force because it is undisputed that he never left from behind his desk. Defs.' Facts at ¶ 84. Finally, Officer Capodanno's deposition testimony clearly implicates him in the arrest and apprehension of Chapolini as he was trying to flee. *See* Capodanno Dep. at 19:1-16. Here, drawing all inferences in favor of the plaintiff, a jury could conclude that Officer Capodanno was the officer who allegedly slammed Chapolini to the ground and twisted his arm.

ii.     *Despite there being an issue of fact as to whether Officer Capodanno was the officer who used excessive force, the court will grant summary judgment because the force used against Chapolini was objectively reasonable under the circumstances.*

Despite the existence of disputed facts concerning the identity of the officer who allegedly applied unconstitutional force against Chapolini, the court must still determine whether the amount of force applied against him was excessive. *See Lamb v. Wysocki*, Civ. A. No. 06-2166(NLH), 2008 WL 1732973, at *5–6 (D.N.J. Apr. 10, 2008) (proceeding to determine whether force applied against plaintiff constituted excessive force after finding the existence of "an issue of material fact as to [the defendant police officer]'s contact with [the plaintiff]"); *see also Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) ("At summary judgment, we . . . must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances."). If the force used against the plaintiff was not excessive, then a dispute as to the identity of the officer who applied force against the plaintiff will not defeat summary judgment. *See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

The defendants assert that their actions in apprehending Chapolini did not constitute excessive force where the officers and Chapolini were engaged in a struggle and Chapolini was attempting to resist arrest. *See* Defs.' Mem. at 4. In response, Chapolini merely states that the parties dispute whether excessive force was used, and points to Officer Donohue's deposition testimony in which he stated that Chapolini complained of left shoulder pain. *See* Pl.'s Mem. at ECF p. 5.

The court finds that the force applied against Chapolini was objectively reasonable under the circumstances; therefore, Chapolini's excessive force claim relating to his arrest must fail.

Claims of excessive force are analyzed under the Fourth Amendment's "'reasonableness' inquiry". *Graham v. Connor*, 490 U.S. 386, 397 (1989). That inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (citing *Scott v. United States* 436 U.S. 128, 137–39 (1978) and *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). The court "ask[s] whether, 'from the perspective of the officer at the time of the incident and not with the benefit of hindsight,' the officers were objectively reasonable in their use of force." *Brown v. Makofka*, 644 F. App'x 139, 142 (3d Cir. 2016) (quoting *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015)). In determining whether the force used was objectively reasonable, the court should carefully consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

While the question of reasonableness is generally one for the jury to decide, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (quoting *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999)). Moreover, "where there is video evidence that contradicts the testimony of an opposing party, the court should not adopt the nonmoving party's facts over the clear video evidence to the contrary." *Hawthorne v. Mun. of Norristown*, Civ. A. No. 15-1572, 2016 WL 454401, at *4 (E.D. Pa. Feb. 5, 2016) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Allen v. Eckard*, 804 F. App'x 123, 126 (3d Cir. 2020) (per curiam) (affirming entry of

summary judgment on plaintiff's excessive force claim where "videotape evidence of the incident blatantly contradicts [the plaintiff]'s version of events" (internal quotation marks omitted)).

This court has reviewed the video footage of Chapolini's arrest and finds that no reasonable jury could conclude that the officers used excessive force in arresting him. *See* Defs.' Mem, Ex. I. The court notes that when he was apprehended, Chapolini was attempting to evade arrest by running out of the police station. Under such circumstances, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Here, the videotape footage, the authenticity of which Chapolini does not dispute, captures Chapolini's flight from the police station lobby, down the steps, and the ensuing struggle with the officers who attempted to arrest him. *See* Defs.' Facts at ¶ 23. The video shows three officers running after Chapolini as he runs down the stairs and attempts to exit the building. One officer then pulls on Chapolini's sweatshirt to prevent him from exiting the station. The two other officers then attempt to subdue Chapolini and pull him to the ground. The three officers then manage to bring Chapolini to the ground and arrest him. After being brought to his feet, Chapolini, now in handcuffs, is able to walk on his own and is led out of the stairwell.

While it is possible that "a less aggressive approach could have achieved the same result . . .'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Brown*, 644 F. App'x at 142–43 (quoting *Graham*, 490 U.S. at 396). Indeed, courts have rejected excessive force claims in situations involving fleeing suspects where the force used against the plaintiff was as much or greater than the force used here. *See, e.g.*, *id.* at 142 (pinning plaintiff to ground and "prying his arms behind his body" were

objectively reasonable where plaintiff was "physically resisting arrest and by crossing his arms and gripping his protective vest so that the officers could not handcuff him"); *Hill v. Havens*, No. 4:18-CV-212, 2018 WL 4184316, at *2 (M.D. Pa. Aug. 31, 2018) (dismissing excessive force claim against officer who "kicked [the defendant] in the chest in the course of an arrest, after [the defendant] had attempted to flee, and after [the defendant] had refused orders to remain on the ground."). Accordingly, the defendants' motion for summary judgment is granted as to the excessive force claim stemming from Chapolini's arrest.

iii.    *The defendants are entitled to qualified immunity on the excessive force claim relating to Chapolini's arrest.*

The defendants argue that they are entitled to qualified immunity because the force used to overcome Chapolini's resistance was reasonable, and because their actions did not rise to the level of conduct that violates the Fourth Amendment. *See* Defs.' Mem. at 8, 11. Chapolini does not argue otherwise. *See generally*, Pl.'s Mem. As further discussed below, the court agrees that the defendants are entitled to qualified immunity.

Qualified immunity is a doctrine that "shields government officials from suit when their conduct does not violate clearly established constitutional law." *Rodriguez v. Panarello*, 119 F. Supp. 3d 331, 341 (E.D. Pa. 2015). To determine whether qualified immunity applies, courts engage in a two-part analysis: first, the court must determine whether a constitutional right was violated; second, it must determine whether the right was clearly established. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A defendant is entitled to qualified immunity if "*either* . . . the official did not violate a constitutional right *or* . . . the right in question was not 'clearly established.'" *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "Although qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury." *Christmann v. Link*, Civ. A.

20

No. 19-1707, 2021 WL 1269917, at *8 (E.D. Pa. Apr. 6, 2021) (quoting *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006)).

With regard to whether the right in question in this case is clearly established, "there is no dispute that the 'right of an arrestee to be free from the use of excessive force in the course of his handcuffing' is clearly established." *Rivera v. Como*, 733 F. App'x 587, 590 (3d Cir. 2018) (quoting *Kopec*, 361 F.3d at 778). The "dispositive issue," then, is whether the record shows that the force used against Chapolini was objectively reasonable as a matter of law. *See id.*

Here, the defendant officers' entitlement to qualified immunity does not turn on disputed issues of fact. As discussed above, although the identity of the particular officer or officers who allegedly applied unconstitutional force against Chapolini is in dispute, the videotape evidence demonstrates that the officers' actions in apprehending Chapolini as he was fleeing the police station were objectively reasonable under the circumstances. The force the officers applied was limited to that reasonably necessary to apprehend and arrest Chapolini. Thus, the defendants' actions did not violate the Fourth Amendment. Because Chapolini has not demonstrated an underlying constitutional violation, the defendants are entitled to qualified immunity. *See Rivera*, 733 F. App'x at 591 (affirming district court's grant of qualified immunity where force applied by arresting officers was not objectively unreasonable under the circumstances).

b.   Excessive Force Claim – Strip Search

Chapolini also asserts a claim for excessive force against Officer Capodanno for allegedly conducting an unauthorized strip search of him. This claim, contained in Count I of the third amended complaint, is only asserted against Officer Capodanno. *See* 3d Am. Compl. at ¶ 27, Doc. No. 63 ("Plaintiff avers he was forcibly strip searched by Defendant Capodanno in a semi-public area, and in front of all the other Defendants . . . .). The defendants have moved for summary

judgment on this claim on the ground that Chapolini has identified the wrong officer, and that in any case, the strip-search conducted on him was neither unconstitutional nor unreasonable as a matter of law. Defs.' Mem. at 12; *see also* Defs.' Facts at ¶ 95.

Although Chapolini does not adopt the portion of the defendants' statement of undisputed material facts asserting that it was not Officer Capodanno who strip-searched him, he acknowledges in his own statement of facts that "Officer Donohue searched [him] while Officer Johnson observed him." *See* Pl.'s Suppl. Statement of Undisputed Material Facts at ¶ 2, Doc. No. 88. In his brief opposing summary judgment, Chapolini repeats this allegation, stating: "Defendant Donohue took the Plaintiff into the jail cell and physically searched him." Pl.'s Mem. at ECF p. 6; *see also id.* at ECF p. 7 (stating that "Defendant Johnson supervised as Defendant Donohue searched Plaintiff").

Because Chapolini acknowledges that Officer Capodanno was not the officer who allegedly conducted a strip-search of him, and the strip-search allegations are only asserted against Officer Capodanno, *see* 3d Am. Compl. at ¶ 27, the court grants summary judgment as to the strip-search component of Chapolini's excessive force claim. *See Jutrowski*, 904 F.3d at 291 (stating that "in the face of [a] motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial").

Moreover, even if the court were to credit Chapolini's statement that an unidentified officer other than Officer Capodanno (or Officer Johnson) could have been the one that conducted a strip-search of him, *see* Chapolini Dep. at 151:1-7, he still cannot defeat summary judgment. Indeed, and as indicated above, where a plaintiff cannot identify the officer responsible for applying excessive force, there is no basis on which to hold any defendant liable. *See, e.g.*, *Williams v. City*

22

*of York, Pa.*, 967 F.3d 252, 261 (3d Cir. 2020) (holding that plaintiff's "allegations that certain unidentified officers put a knee to her back, tripped her, and were 'forceful and rough' in handling her cannot survive summary judgment"); *Sharrar*, 128 F.3d at 821 ("[Plaintiff], who could recognize all of the defendant officers, was unable to identify which police officers were in the police car with him at the time of the alleged abuse. There was therefore no evidentiary basis on which to hold these defendants liable"); *Howell*, 464 F.2d at 283 (affirming district court's grant of judgment as a matter of law to defendants on Eighth Amendment claim against police officer defendants where "[a]t best, there was proof of wrongful conduct of *one*, identified only as one of two possible actors, without an explicit identification as to which of the two" (emphasis in original)); *cf. Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002) (allowing excessive force claim to proceed to trial despite plaintiff's admission that he was "not sure that [all five defendant-correctional officers] participated in the beating at all" where he nevertheless testified that "*all of them* . . . were pushing my head, right, into the cabinets in the wall," and "the full force of *all the guards* [was] behind me . . . I said all of them" (boldface omitted)).

c.   <u>Excessive Force Claim – Body Cavity Search</u>

Beyond the excessive force claim involving Chapolini's arrest and subsequent strip-search, there is, intertwined in Count I of the third amended complaint, a claim for excessive force arising from the alleged body cavity search conducted on Chapolini. *See* 3d Am. Compl. at ¶ 29 (alleging that Officer Capodanno "grabbed his testicles and searched his anus causing the Plaintiff extreme pain"). In moving for summary judgment on this claim, the defendants argue (as they did with respect to his claim pertaining to the strip-search) that Chapolini is unable to identify which officer allegedly performed the body cavity search, and that this failure is fatal to his claim. *See* Defs.' Mem. at 16–17. They assert that while Chapolini initially identified Officer Capodanno as the

perpetrator, he later "walked back" this testimony and later suggested that one of multiple officers with him in the holding cell did it. *Id.* In response to the defendants' argument, Chapolini states that although he "did not know the officer who searched him, . . . it was one of the persons who handcuffed him." Pl.'s Mem. at ECF p. 7.

"Where the plaintiff fails to identify which defendant officer is responsible for the alleged excessive force, there is no evidentiary basis on which to hold any of the defendants liable." *McNeil*, 694 F. Supp. 2d at 395. Summary judgment is warranted where the plaintiff "has narrowed the potential universe of actors to those that were in his immediate vicinity," but nevertheless fails to produce evidence supporting an individual defendant's involvement. *Jutrowski*, 904 F.3d at 291-92; *see also Seward*, 2002 WL 563580, at *2 (collecting cases). Here, Chapolini names Officer Capodanno as the one who performed a body cavity search on him in the operative complaint, *see* 3d Am. Compl. at ¶ 29.  However, his deposition testimony is more equivocal. First, he states that Officer Capodanno is the one who "ran his fingers through my anus, yes." Chapolini Dep. at 131:2. Later on, however, he admits that another officer might have been the one that conducted the search on him. *See id.* at 151:1-7 ("Q. It would be fair to say, since you don't have eyes in the back of your head and you weren't looking that way, that an officer other than Officer Capodanno might have actually participated in the search of you in that cell room; is that a fair statement? A. Yes."); *see also id.* at 164:6-14 ("Q. Because your back was turned, is it fair to say it would have been one officer, it could have been the officer that you believed was searching you or it could have been a different officer that touched . . . A. Yes, that's correct.").

Because Chapolini has, at best, narrowed the potential universe of perpetrators to Officers Donohue, Capodanno, McDonald, and Johnson, there is insufficient evidence upon which to hold these defendants liable for the alleged body cavity search. *See Damiani v. Duffy,* 754 F. App'x

142, 146 n.3 (3d Cir. 2018) (per curiam) ("[Plaintiff's] unsupported and inconsistent assertions that these defendants were directly, physically involved in violating his constitutional rights do not permit his excessive force claims to survive summary judgment."). In this regard, the court notes that unlike the excessive force claim arising from his arrest, Chapolini has failed to identify a genuine dispute of material fact concerning the identity of the officer who allegedly conducted the body cavity search on him. As indicated above, with regard to the excessive force claim arising out of his arrest, Chapolini testified that Officer Capodanno was the only one he was accusing of applying excessive force against him during the arrest. *See* Defs.' Facts at ¶ 35. Moreover, both Officer Capodanno's own deposition testimony and the video evidence implicated him in Chapolini's arrest. *See* Capodanno Dep. at 19:1-16; Ex. I.

Here, by contrast, Chapolini does not allege that Officer Capodanno—or any single officer for that matter—was the officer that allegedly conducted the body cavity search on him. Indeed, he states in his deposition testimony that Officer Capodanno—or another officer present in the cell during the search—could have performed the body cavity search on him. *See* Chapolini Dep. at 151:1-7. Moreover, Officer Capodanno did not implicate himself in the alleged body cavity search; he affirmatively testified in his deposition that he did not search Chapolini and that he was in an adjacent room at the time of the search. *See* Defs.' Facts at ¶¶ 95–96. Because Chapolini has not identified the officer who "bore primary responsibility" for the alleged body cavity search, he has failed to identify a genuine issue of material fact sufficient to survive summary judgment. *See Dixon*, 2020 WL 4600187, at *5.

### 2.      Failure to Intervene Claim

Because Chapolini is "unable to establish as a matter of law, the predicate constitutional violation necessary to establish the first element of a failure to intervene claim—that a

constitutional violation took place in their presence or with their knowledge," *Waugaman v. City of Greensburg*, Civ. A. No. 2:17-330, 2019 WL 2410818, at *10 (W.D. Pa. June 7, 2019), the court will grant summary judgment in favor the defendants on Chapolini's failure to intervene claim. *See Klein v. Madison*, 374 F. Supp. 3d 389, 419 (E.D. Pa. 2019) ("To be directly liable under a failure to intervene theory, (1) the plaintiff must have demonstrated that her underlying constitutional rights were violated; (2) the officer had a duty to intervene; and (3) the officer must have had a realistic and reasonable opportunity to intervene." (internal citations, quotations, and alterations omitted)).

### III.   CONCLUSION

For the reasons set forth above, the court grants the defendants' motion for summary judgment as to Chapolini's section 1983 claims for excessive force and failure to intervene.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.